Robert T. Haslam (SBN 71134)
rhaslam@cov.com
Anupam Sharma (SBN 229545)
asharma@cov.com
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: 650-632-4700
Fax: 650-632-4800

David A. Garr (admitted *pro hac vice*)
dgarr@cov.com
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001-4956
Telephone: 202-662-6000
Fax: 202-662-6291

*Attorneys for Defendant Aruba Networks, LLC*

[*Additional counsel on signature page*]

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| XR COMMUNICATIONS, LLC dba VIVATO TECHNOLOGIES,<br><br>    Plaintiff,<br><br>    v.<br><br>D-LINK SYSTEMS, INC., et al.,<br><br>    Defendants. | Case No.: 8:17-cv-00596-DOC (LEAD)<br><br>**DEFENDANTS' RESPONSE TO XR'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT**<br><br>Hearing Date:    October 3, 2022<br>Hearing Time:    8:30 a.m.<br>Courtroom:    10 A<br>Judge:    Hon. David O. Carter |

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................................ 1

II.     STATEMENT OF FACTS ............................................................................. 3

III.    LEGAL STANDARDS ................................................................................. 4

        A.      Summary Judgement ......................................................................... 4

        B.      Inequitable Conduct and Unclean Hands............................................. 4

        C.      Petitions to Revive Abandoned Patent Applications .......................... 5

        D.      Unintentional Abandonment ............................................................. 6

IV.     ARGUMENT.................................................................................................. 7

        A.      Aequitas and Catcher deliberately permitted the applications to be
                abandoned by choosing not to fund prosecution of the applications ... 8

        B.      Mr. Schwedler and Mr. Burke made misrepresentations to the Patent
                Office in the petitions to revive the applications. .............................. 10

        C.      Mr. Schwedler's and Mr. Burke's misrepresentations in the petitions
                to revive were material. ...................................................................... 17

        D.      Mr. Schwedler and Mr. Burke each had specific intent to deceive the
                Patent Office....................................................................................... 18

        E.      XR's proposal would reward those who bury their heads in the sand.
                .......................................................................................................... 22

V.      CONCLUSION............................................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*,
   228 F. Supp. 3d 1331 (N.D. Ga. 2017)...................................................................*passim*

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................................................................4

*In re Application of Cheol Kim,* 09/254,058, 2009 WL 1212054 (P.T.O. Apr.
   1, 2009) ...........................................................................................................6, 8, 10

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, No. 16 C 6097, 2017 WL
   1101092 (N.D. Ill. Mar. 22, 2017)...............................................................................5

*Glaukos Corp. v. Ivantis*, Inc., No. SACV 18-620 JVS (JDEx), 2019 WL
   4198641 (C.D. Cal. July 17, 2019)...............................................................................5

*Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc.*,
   606 F.3d 1353 (Fed. Cir. 2010) .................................................................................22

*Lumenyte Int'l Corp. v. Cable Lite Corp.*,
   92 F.3d 1206, 1996 WL 383927 (Fed. Cir. 1996)...............................................*passim*

*In re Maldague*,
   10 USPQ2d 1477 (Comm'r Pat. 1988).........................................................................7

*Ohio Willow Wood Co. v. Alps South, LLC*,
   735 F.3d 1333 (Fed. Cir. 2013) .................................................................................22

*In re Rembrandt Techs. LP Patent Litig.*,
   899 F.3d 1254 (Fed. Cir. 2018) ...................................................................................5

*Star Sci. Inc. v. R.J. Reynolds Tobacco Co.*,
   537 F.3d 1357 (Fed. Cir. 2008) .................................................................................18

*Therasense v. Becton, Dickinson and Co.*,
   649 F.3d 1276 (Fed. Cir. 2011) (*en banc*)..............................................................*passim*

*Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*,
   351 F.3d 1139 (Fed. Cir. 2003) .................................................................................17

**Other Authorities**

37 CFR § 1.137 ...................................................................................................*passim*

37 CFR § 10.18 ........................................................................................................ 6

37 CFR § 11.18 ............................................................................................ 6, 11, 17

Fed. R. Civ. P. 56 ................................................................................................. 2, 4

Fed. Reg. Vol. 78, No. 64, April 3, 2013 ............................................................... 6

MPEP 711.03 (c). Rev. 6, Sept. 2007 ................................................................. 5, 6

## I.     INTRODUCTION

In 2009 and 2010, Aequitas (XR's predecessor-in-interest to the asserted patents) and XR filed petitions to revive three abandoned patent applications: 10/700,342 (issued as Patent No. 8,289,939); 11/420,860 (issued as Patent No. 7,729,728); and 10/700,342 (parent to application that issued as Patent No. 10,594,376). The petitions to revive included certifications by Mr. Schwedler (attorney for Aequitas) and Mr. Burke (attorney for XR) that the applications had been abandoned unintentionally and that they had conducted a reasonable investigation into the circumstances resulting in the abandonment.

But contrary to Mr. Schwedler's and Mr. Burke's representations to the Patent Office, *the applications had been deliberately abandoned in early 2008*. From fall of 2006, Mr. Brooks had been the attorney responsible for prosecuting a patent portfolio that included the above mentioned applications. Starting from fall of 2007, Catcher and its financier, Aequitas Capital, became responsible for prosecuting that patent portfolio but refused to reimburse Mr. Brooks for his prosecution services. In Q4 2007 and Q1 2008, Mr. Brooks repeatedly sought payment on his pending invoices. Even though funds were available to Catcher and Aequitas Capital, they chose not to reimburse Mr. Brooks. As a result, Mr. Brooks withdrew as attorney of record in April 2008, and the pending applications became abandoned in due course when office actions went unanswered. According to the Patent Office rules that were in force at that time, abandonment that results from non-payment of prosecution fees or an attempt to defer such fees is considered a *deliberately chosen course of action* and is *not* unintentional abandonment. Thus, Mr. Schwedler's and Mr. Burke's certifications to the Patent Office that the applications had been abandoned unintentionally were *false*.

Further, both Mr. Schwedler and Mr. Burke represented to the Patent Office that their certification of unintentional abandonment was based on a reasonable investigation as required by the Patent Office rules. In fact, *neither Mr. Schwedler nor Mr. Burke had conducted a reasonable investigation*. Their failure to investigate is remarkable because

1

***they did not have firsthand or direct knowledge of the relevant facts***. In granting the petitions to revive, even the Patent Office noted that Mr. Schwedler and Mr. Burke lacked personal knowledge of the facts and reminded them of their duty to conduct an investigation. Without conducting any verifiable investigation at all, both attorneys certified that the abandonments were unintentional and that they had conducted the requisite investigations. Mr. Schwedler's certification was all the more egregious because he never interviewed any individual at Aequitas Capital even though Aequitas Capital was Mr. Schwedler's client. Relying on those false certifications, the Patent Office revived the abandoned applications, which eventually matured into the asserted patents.

Despite these facts, XR seeks summary judgement of no inequitable conduct based on self-serving testimony by Mr. Schwedler and Mr. Burke that they had no intent to deceive the Patent Office, and that they would have conducted reasonable investigations before filing the petitions to revive. XR effectively concedes that Mr. Schwedler and Mr. Burke were negligent or even grossly negligent in fulfilling the duty imposed by the Patent Office, but nevertheless asks that the Court credit their testimony. XR's motion should be denied because the evidence uniformly leads to the opposite conclusion—that Mr. Schwedler and Mr. Burke made a material misrepresentation to the Patent Office with intent to deceive.[1]

The evidence, consisting of depositions of prosecuting attorneys and business-people involved in the revival as well as documentary evidence of the reasons for the abandonment, demonstrates inequitable conduct as a matter of law under the clear and convincing standard. But at minimum, the evidence raises considerable doubt about the veracity of Mr. Schwedler and Mr. Burke's testimony that they did not have intent to

---

[1] Aruba Networks, LLC ("Aruba") did not move for summary judgement of unclean hands based on inequitable conduct because Aruba's request to add that defense was not granted until the date on which the summary judgement motions were due, Dkt. 400, and Aruba had chosen to devote its allocation of pages to other issues.

deceive and that they conducted reasonable investigations, and thus precludes summary judgment in XR's favor.

## II.   STATEMENT OF FACTS

In 2003, Vivato, Inc. filed the patent applications that eventually (directly or through a chain of continuations) led to issuance of the asserted patents. D-SUF ¶¶ 1-3.[2] In 2006, Mr. Gary Haycox purchased Vivato, Inc.'s patent portfolio, including the patent applications that resulted in the asserted patents, and eventually assigned the portfolio to Vivato Networks, Inc. ("Vivato Networks"). SUF ¶ 11. Mr. Haycox was the CEO of Vivato Networks. *Id.* In fall of 2006, Mr. Haycox retained Mr. Edward Brooks, a registered patent attorney, to prosecute the patent portfolio. SUF ¶ 8.

In fall of 2007, Vivato Networks agreed to a loan of $1,000,000 from Aequitas Capital Management ("Aequitas Capital") secured by the patent portfolio. D-SUF ¶¶ 9-10. Later that year, Vivato Networks merged with Catcher Holdings, Inc. ("Catcher") and also transferred the patent portfolio to Vivato Networks Holdings Inc. ("Vivato Holdings") subject to a first priority lien by Aequitas Capital. D-SUF ¶¶ 11-13, 33-35. Vivato Holdings also granted an exclusive license to Catcher and an exclusive right to prosecute and maintain the portfolio during the term of the license. D-SUF ¶¶ 14, 38. Mr. Haycox eventually became the CEO of Catcher. SUF ¶ 11. Mr. Brooks continued to prosecute and maintain the portfolio. D-SUF ¶ 36. By virtue of its loan to Catcher, Aequitas Capital though its manager, Mr. Thomas Sidley, controlled all disbursements by Catcher. Starting in Q4 of 2007 and into Q1 2008, Mr. Brooks repeatedly sought payment of his pending invoices for his services for prosecuting the patent portfolio. D-SUF ¶¶ 39-42, 49-50. Mr. Sidley decided to not fund the prosecution and did not reimburse Mr. Brooks even though Catcher and Aequitas Capital had sufficient funds to do so. D-SUF ¶¶ 10, 18, 43-48. Mr. Brooks eventually withdrew as the attorney of record at the Patent Office in late April

---

[2] SUF refers to Plaintiff's Statement of Uncontroverted Facts, Dkt. 419. D-SUF refers to Defendants' Statement of Additional Uncontroverted Facts, filed concurrently herewith.

2008, and several applications inevitably became abandoned. SUF ¶¶ 18, 20, 21; D-SUF ¶ 5. In April 2008, Catcher Holdings ceased operations and Aequitas Equipment Finance, LLC ("Aequitas Finance"), assignee of Aequitas Capital's right to the portfolio, began foreclosure proceeding regarding the portfolio in June 2008. SUF ¶¶ 16, 19.

Over a year later, in May 2009, Mr. Schwedler filed a power of attorney with the Patent Office, D-SUF ¶ 73, and in June of 2009, Aequitas Equipment took title to the patent portfolio in a sheriff's sale. SUF ¶¶ 23, 24. In fall of 2009, Mr. Schwedler (attorney for Aequitas Equipment and Aequitas Capital) filed petitions to revive the abandoned applications certifying that the abandonment of the '860, '324, and '329 application was unintentional. SUF ¶ 25; D-SUF ¶¶ 19-20. In December of 2009, Aequitas Equipment sold the patent portfolio to XR. D-SUF ¶ 15. In 2010, Mr. Burke (attorney for XR) also filed petitions to revive the '329 application certifying that the abandonment was unintentional. D-SUF ¶ 26-27. During their depositions, Mr. Schwedler and Mr. Burke did not recall any facts about the factual investigation that informed their petitions to revive but testified nonetheless that they did not have an intent to deceive the Patent Office and that they did not make misrepresentations to the Office. D-SUF ¶¶28-29, 51-52, 57-59.

## III.   LEGAL STANDARDS

### A.   Summary Judgement

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.   Inequitable Conduct and Unclean Hands

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (*en banc*). To prove inequitable conduct, the challenger must show

by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the Patent Office. *Id.* at 1287. "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.* at 1290.

The Federal Circuit has consistently held that a finding of inequitable conduct may be based upon falsely certifying in a revival petition that a period of delay was unintentional. *See, e.g.*, *In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1273 (Fed. Cir. 2018) ("[T]he PTO would not have revived the patents if it had known that Paradyne consciously allowed them to expire. In other words, the statement was material to patentability—or at least continued enforceability. . . . Paradyne's alleged mistake of fact is no defense."); *Lumenyte Int'l Corp. v. Cable Lite Corp.*, 92 F.3d 1206, 1996 WL 383927, at *4 (Fed. Cir. 1996) ("[T]he decision of the district court that Lumenyte acted inequitably by reviving the abandoned parent application with a false declaration of inadvertence was not an abuse of discretion and is therefore affirmed.").

In addition, courts have regularly recognized that an unclean hands defense may be based on inequitable conduct. *See, e.g.*, *Glaukos Corp. v. Ivantis*, Inc., No. SACV 18-620 JVS (JDEx), 2019 WL 4198641, at *8 (C.D. Cal. July 17, 2019); *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, No. 16 C 6097, 2017 WL 1101092, at *17 (N.D. Ill. Mar. 22, 2017) ("Where an accused infringer's unclean hands defense is based on alleged acts of inequitable conduct, it rises and falls based on those allegations.").

### C.     Petitions to Revive Abandoned Patent Applications

When an application is abandoned, the applicant may petition the Patent Office to "revive" the application to restore it to pending status. Pursuant to 37 CFR § 1.137(b), an applicant may seek to revive stating that the abandonment was unintentional.[3] Such a petition to revive must include, among other things, "[a] statement that the entire delay in

---

[3] *See* 37 CFR § 1.137 and MPEP 711.03 (c). Rev. 6, Sept. 2007.

filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this section was unintentional." [4]

Anyone submitting any paper or advocating any position before the Patent Office has an obligation to make a reasonable inquiry into the underlying facts to ensure that all factual contentions have evidentiary support. *See* 37 CFR § 11.18(a)-(b).[5] The Office relies on patent owners and their representatives to be truthful and to ensure that statements made to the Office are accurate and correct after an inquiry reasonable under the circumstances. Thus, Courts have found inequitable conduct, as here, where a patent owner represents facts to the Office without knowledge of whether they are true or not. *See, e.g.*, *3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331, 1336–39 (N.D. Ga. 2017) (finding inequitable conduct where a patent owner represented to the Patent Office that non-payment of maintenance fees by a prior owner was unintentional without conducting an investigation to determine why the prior owner failed to pay on time).

### D. Unintentional Abandonment

"A delay resulting from a deliberately chosen course of action on the part of the applicant does not become an "unintentional" delay within the meaning of 37 CFR 1.137(b) because . . . the applicant remains interested in eventually obtaining a patent, but simply seeks to defer patent fees and patent prosecution expenses." *See* MPEP 711.03 (c) II. C. Rev. 6, Sept. 2007. Abandonment resulting from a decision to defer prosecution fees is a deliberately chosen course of action and not unintentional under 37 CFR 1.137(b). *In re Application of Cheol Kim*, Application 09/254,058, 2009 WL 1212054, at *3 (P.T.O. Apr. 1, 2009) (finding that applicant's failure to pay prosecuting attorney's legal fees because he did not have money to do so, knowing that he could not reply to pending Office Action without counsel and knowing the consequences of failure to prosecute, was not

---

[4] *See* MPEP 711.03 (c) II. Rev. 6, Sept. 2007.

[5] 37 CFR § 11.18 replaced 37 CFR § 10.18 in 2013. *See* Fed. Reg. Vol. 78, No. 64, April 3, 2013. The substance of the rule, however, did not change.

unintentional). An intentional course of action is not rendered unintentional when, upon reconsideration, the applicant changes his or her mind as to the course of action that should have been taken. *See In re Maldague*, 10 USPQ2d 1477, 1478 (Comm'r Pat. 1988).

## IV. ARGUMENT

Catcher and Aequitas Capital made a deliberate decision in Q1 2008 to not fund the prosecution when it chose not to reimburse Mr. Brooks leading to eventual abandonment of the applications. Thus, Mr. Schwedler's and Mr. Burke's certifications to the Patent Office were demonstrably false. Further, not only were the applications not abandoned unintentionally, Mr. Schwedler and Mr. Burke did not perform any verifiable investigation, and undisputedly did not investigate, the facts surrounding the abandonments. Though both claimed to have done such an investigation, neither of them could provide any details or any documentary evidence to support their claims. Neither of them had direct knowledge regarding the circumstances that led to the abandonments, and neither of them contacted the individuals who did have firsthand knowledge. Had either of them conducted the required investigation, they would have uncovered that the applications were deliberately abandoned when Catcher and Aequitas Capital did not reimburse Mr. Brooks.

The single most reasonable inference from the evidence is that both Mr. Schwedler and Mr. Burke had an intent to deceive the Patent Office. Mr. Schwedler admitted that after Aequitas Equipment purchased the patent portfolio, he was handed the abandoned applications with instructions to "keep the balls in the air." He admitted that he did not talk to the inventors, he was resource constrained, and his work on the applications was a "rush job." By virtue of his work with Aequitas Capital in 2007 when he filed the security agreement with the Patent Office on behalf of Aequitas Capital, Mr. Schwedler knew that Aequitas Capital had a lien on the portfolio, and he knew in 2009 that there had been a foreclosure, but he chose to not investigate into the circumstances that caused the abandonment. Similarly, Mr. Burke was also aware of abandoned applications based on his work the Patent Purchase Agreement between Aequitas and XR and his review of the file histories. He justified his lack of further investigation by deluding himself: because no

one wanted the applications to be abandoned, they could not have been abandoned intentionally. As experienced registered patent attorneys, both knew that, under the Patent Office rules, an application is deliberately abandoned when an applicant knowingly chooses to not incur prosecution expense resulting in abandonment of pending applications.[6] Both Mr. Schwedler and Mr. Burke chose to remain willfully ignorant of the circumstances that led to the abandonments and chose to ignore warnings from the Patent Office that further investigation was warranted based on their lack of personal knowledge. In light of these circumstances, the only plausible inference is that both Mr. Schwedler and Mr. Burke intended to deceive the Patent Office so that the applications could be revived.

Against the backdrop, XR argues that the Court should give full credit to Mr. Schwedler's and Mr. Burke's self-serving testimony and grant summary judgement of no inequitable conduct. To the contrary, the evidence supports a finding of inequitable conduct, and at a minimum, precludes summary judgement for XR.

### A. Aequitas and Catcher deliberately permitted the applications to be abandoned by choosing not to fund prosecution of the applications

Both the Patent Office and Federal Circuit have repeatedly held that patent applications become abandoned due to failure to pay attorneys' fees and necessary costs of prosecution are considered intentional abandonments. *See, e.g.*, *Lumenyte*, 92 F.3d 1206, at *4 (finding patent applications intentionally abandoned where evidence showed, *inter alia*, that applicant said he did not want to spend additional money prosecuting the patent) (cited in MPEP); *Cheol Kim*, 2009 WL 1212054, at *3 (P.T.O. Apr. 1, 2009) (finding delay not unintentional where applicant "gave up" application because he could not afford to pay prosecuting attorney).

Here, there is no dispute that Mr. Brooks withdrew as the attorney prosecuting the patent applications because he had not been paid for his services for nearly a year. D-SUF

---

[6] For example, according to the public records of the Patent Office, Mr. Burke registered as a patent agent in 1982 and as patent attorney in 1989.

¶¶ 48-50. And, Vivato Networks (which merged with Catcher, who controlled prosecution of the applications) did not lack funds—it had received a $1 million loan from Aequitas Capital and could therefore pay its attorneys' fees—a loan secured by a patent portfolio containing the applications. D-SUF ¶¶ 9-10. Mr. Haycox testified that he was aware of the invoices from Mr. Brooks regarding prosecution of the patent portfolio. D-SUF ¶ 44. He also testified that he repeatedly notified Mr. Sidley, the primary manager at Aequitas Capital, that the patents and applications required attention and that Aequitas Capital had responsibility under the contract to ensure that the portfolio remained up to date. D-SUF ¶ 43. Mr. Haycox testified that he notified Aequitas Capital of the need to keep the portfolio up to date on numerous occasions and that Mr. Brooks would withdraw as attorney if his invoices were not paid. D-SUF ¶ 44. Mr. Haycox also met regularly with Mr. Sidley and apprised him of the need to maintain the patent portfolio and the fact that Mr. Brooks had not been paid. D-SUF ¶¶ 45-47.

Under the Security Agreement between Catcher and Aequitas Capital, Aequitas Capital had the right to expend funds to protect the collateral. Ex. I[7] (Commercial Security Agreement) at 5. The Security Agreement also provided that in the event of default, Aequitas Capital had the right to take possession of the collateral. *Id.* at 6. Aequitas Equipment, in May 2009, apparently exercising that right, appointed Mr. Schwedler as prosecution counsel even before it obtained legal possession of the portfolio. D-SUF ¶ 73. Yet from the time Mr. Brooks withdrew in April 2008 and until May 2009 when it appointed Mr. Schwedler, neither Aequitas Capital nor Aequitas Equipment took any steps to protect the portfolio or its interest in it. The Aequitas entities, through their manager, Mr. Sidley, first deliberately abandoned the applications when they decided to not reimburse Mr. Brooks but turned around about a year later and initiated prosecution on the

---

[7] Exhibits cited throughout are attached to the Declaration of Anupam Sharma in Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment of No Inequitable Conduct filed concurrently herewith.

same portfolio through Mr. Schwedler even before they had obtained title to that portfolio.

Under these circumstances, Catcher and Aequitas Capital's decision to not reimburse Mr. Brooks for his services was a deliberate decision to not act on the pending applications, which could not constitute an "unintentional" abandonment under controlling law. This was indisputably the law at the time of the abandonments and has remained so. *See Lumenyte*, 92 F.3d 1206, at *4; *Cheol Kim*, 2009 WL 1212054, at *3.

### B. Mr. Schwedler and Mr. Burke made misrepresentations to the Patent Office in the petitions to revive the applications.

As noted above, Aequitas Capital and Catcher deliberately allowed the applications to become abandoned. Thus, Mr. Schwedler and Mr. Burke "could not have truthfully certified" to the Patent Office that the entire periods of delay were unintentional. *3D Med.*, 228 F. Supp. 3d at 1337. Their certifications were thus material misrepresentations as a matter of law. *Id.*; *see also Lumenyte*, 92 F.3d 1206, at *4. Further, by signing the petitions to revive, Mr. Schwedler and Mr. Burke also represented that they had knowledge of facts sufficient to support their belief that the applications were abandoned unintentionally. These were also material misrepresentations as a matter of law.

### 1. Mr. Schwedler misrepresented to the Patent Office that he knew something that he did not.

Mr. Schwedler's affirmative certification to the Patent Office that the entire period of delay from the deadlines for filing replies to the pending office actions to the dates the petitions for revival were filed was "unintentional" was a misrepresentation, because Mr. Schwedler did not have personal knowledge of the reason for the delays and did not do any verifiable investigation to find out whether the statement of unintentional delay had factual support. Had any investigation been performed at all, Mr. Schwedler would have uncovered facts directly contrary to his representations.

### a) Mr. Schwedler did not speak to anyone who was aware of the circumstances leading to the abandonment of the applications.

The Patent Office requires any party submitting any paper to the Office to certify that all statements made in the paper are true and formed after an inquiry reasonable under the circumstances. *See* 37 CFR § 11.18(a)-(b). The rules also state that by submitting the paper, that party certifies that all the statements made therein of their own knowledge are true and that factual allegations have evidentiary support. *Id.*

Mr. Schwedler was not directly involved with the prosecution of the applications until he was appointed the attorney of record in May of 2009. D-SUF ¶ 73.  As he implied in his deposition, Mr. Schwedler lacked personal knowledge of the facts that transpired between November of 2007 and April of 2008, which led to the abandonment of the applications. D-SUF ¶ 73. Because Mr. Schwedler did not have personal knowledge, the Patent Office rules obligated him to investigate the facts that underpin his certification. Yet, Mr. Schwedler chose to not contact anyone who had "firsthand or direct knowledge" of the events that led to the abandonment of the application. At his deposition, Mr. Schwedler admitted that:

- he did not recall speaking with anyone at his clients Aequitas Equipment and Aequitas Capital, including Mr. Sidley, about the circumstances under which the applications had become abandoned (D-SUF ¶¶ 21, 51, 52); *see, e.g.*, Ex. D (Schwedler Depo.) at 29:14-19 ("Q. You don't recall having talked with anyone at the client, Aequitas Capital or Aequitas Equipment Finance, in connection with the attempts to revive the abandoned applications; is that correct? A. That is correct.");

- he did not recall speaking to Mr. Brooks himself about why Mr. Brooks had withdrawn or failed to file responses to the pending office actions (D-SUF ¶ 22); *id.* at 29:20-24 ("Q. And it's your best recollection that you did not talk to Mr. Brooks about the circumstances surrounding his withdrawal from prosecuting the

files; is that correct? A. That's correct."); *id.* at 48:23-29:1 ("Q. You did not talk to the prior counsel who had been prosecuting the patents at the time they went abandoned, correct? A. I do not remember doing that, no.");

- he did not recall having any conversation with Mr. Ambrose, the attorney who was identified by Mr. Brooks as the point of contact for the Patent Office with respect to the pending applications (D-SUF ¶ 55); *id.* at 39:14-17 ("Q. Do you recall having had any conversations with a Mr. Ambrose concerning the Vivato Networks' portfolio? A. I don't recall that."); and

- he did not recall having any conversations with Mr. Haycox or anyone previously associated with the oversight of the portfolio of Vivato Networks Holdings (D-SUF ¶ 54); *id.* at 31:20-31:3 ("Q. Do you have -- recall ever having any conversations with a Mr. Haycox? A. Not offhand, no. Q. Do you recall having any conversations with anyone who had previously been associated with the Vivato Networks Holdings' portfolio in connection with attempts to sell the portfolio? A. No, I don't believe -- I don't believe I was involved with that.").

When questioned about his investigation regarding abandonment, Mr. Schwedler claimed to have spoken with a corporate attorney at his law firm. But Mr. Schwedler could not provide any details of the alleged conversation with the corporate attorney that pertained to the circumstances surrounding the abandonment or even the identity of the alleged corporate attorney. Ex. D (Schwedler Depo.) at 10:24-11:7, 28:9-14. Mr. Schwedler recalled that in his conversation with the corporate attorney, he may have discussed the ownership of the entities and that there had been a bankruptcy. *Id.* at 23:6-24:6, 33:16-34:7. But there is no evidence that the corporate attorney conducted any factual investigation or had firsthand or direct knowledge regarding the abandonment.

Further, each of the fact witnesses possessing direct, personal knowledge of the circumstances of the abandonments testified that they do not recall Mr. Schwedler ***ever contacting them***. *See, e.g.*, D-SUF ¶¶ 66 (Brooks), 65 (Haycox), 56 (Ambrose).

**b)** **Mr. Schwedler ignored warnings from the Patent Office to conduct a factual investigation.**

When evaluating the petitions to revive abandoned applications, the Patent Office relies on the certification that the abandonment was unintentional, assumes that the certification was informed by a reasonable investigation, and routinely grants the petition without much scrutiny. Mirroring the common practice, the Office granted two of three petitions filed by Mr. Schwedler. D-SUF ¶ 23. Notably, the Patent Office observed that it appeared that Mr. Schwedler did not "have firsthand or direct knowledge of the facts and circumstances of the delay at issue" and advised Mr. Schwedler to conduct an inquiry if he did not have firsthand or direct knowledge. *Id.* The Patent Office's decisions to revive the '342 and '860 applications each stated that:

> It is not apparent whether the person signing the statement of unintentional delay was in a position to have firsthand or direct knowledge of the facts and circumstances of the delay at issue. Nevertheless, ***such statement is being treated as having been made as the result of a reasonable inquiry into the facts and circumstances of such delay*** . . . . ***In the event that such an inquiry has not been made, petitioner must make such an inquiry***. If such inquiry results in the discovery that it is not correct that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 CFR 1.137(b) was unintentional, petitioner must notify the Office.

D-SUF ¶ 24; Dkt. 368-29 at 2; Dkt. 368-30 at 1. In spite of these ***explicit instructions*** from the Patent Office to conduct a factual investigation, Mr. Schwedler did not attempt to gain the missing "firsthand or direct knowledge of the facts and circumstances" that led to the abandonment.

Had Mr. Schwedler done any investigation, there would have been no question that the patent applications could not have been considered unintentionally abandoned. His conclusory testimony to the contrary should be disregarded.

**2.** **Mr. Burke misrepresented that he knew something that he did not.**

Mr. Burke also made a misrepresentation to the Patent Office when he affirmatively certified that the entire period of delay from the deadline for filing a reply to the pending office action to the date the petition for revival was filed was "unintentional." Mr. Burke did not have personal knowledge of the reason for the delays, D-SUF ¶ 28, and did not do any verifiable investigation to find out whether the statement of unintentional delay had factual support. Had any investigation been performed at all, Mr. Burke would have uncovered facts directly contrary to his representations.

Just as it did in the '342 and '860 patent application with Mr. Schwedler, the Patent Office noted that Mr. Burke did not appear to have "firsthand and direct knowledge of the circumstances that led to the abandonment of the '329 application. D-SUF ¶ 30. The Office told Mr. Burke that the statement of unintentional delay "*is being treated as having been made as the result of a reasonable inquiry into the facts and circumstances of such delay*" and explicitly warned him to make such an inquiry and notify the Office if he found facts contrary to his certification. D-SUF ¶ 31; Dkt. 368-36 at 1.

Yet Mr. Burke's sworn testimony shows that he ducked his head in the sand. He did not even recall what he did to determine that the patent application was unintentionally abandoned due to a failure to timely respond to the pending office action, D-SUF ¶ 57, or what diligence he had conducted to determine that the entire period of delay was unintentional, D-SUF ¶ 58. He did not recall who he spoke to regarding why the applications were abandoned. D-SUF ¶ 59. Mr. Burke did not recall talking to either Mr. Sidley or anyone else at Aequitas Equipment regarding his work for XR, D-SUF ¶ 60, did not remember talking to Mr. Brooks in connection with his work for XR, D-SUF ¶ 61, and did not recall talking to Mr. Haycox, Mr. Ambrose, anyone associated with Catcher, Vivato Networks Holdings, or the pre-merger Vivato Networks, Inc., or even Mr. Schwedler, who filed the initial petitions to revive in the same application. D-SUF ¶ 62. The only inference is that Mr. Burke cared only about getting the revival accomplished, regardless of the facts. As he testified somewhat proudly, "I mean, it *didn't go abandoned on my watch* so to speak." Ex. E (Burke Depo.) at 90:16-17.

Further, the fact witnesses possessing direct, personal knowledge of the circumstances of the abandonments testified that they do not recall Mr. Burke **ever contacting them**. *See, e.g.*, D-SUF ¶¶ 66 (Brooks), 63 (Haycox), 64 (Ambrose). Mr. Schwedler also had no recollection of speaking with Mr. Burke. Ex. D (Schwedler Depo.) at 39:3-13. Moreover, Mr. Burke volunteered: "A. I don't know what I did. And not necessarily, no." Ex. E (Burke Depo.) at 90:3-4 (volunteering he did not know what he did, and indicating he did not necessarily document any investigation he did).

\* \* \*

Courts have found inequitable conduct as a matter of law under similar facts. In *3D Medical*, a company called IMS, on the verge of bankruptcy, had allowed a patent application to lapse for financial reasons. *3D Med.*, 228 F. Supp. 3d at 1334. After the bankruptcy, the portfolio ended up with Mr. Bailey who later brought the action. *Id.* Mr. Bailey knew that the recently acquired patent application had been abandoned. *Id.* at 1334-35. But Mr. Bailey, without conducting any investigation, certified to the Patent Office that "the delay in payment of the maintenance fee to this patent was unintentional." *Id.* at 1335. Rejecting the same arguments XR has made in this case that Mr. Bailey "'believed that he was allowed to reinstate the patent . . . based on the facts as he understood them at the time, and that no further investigation was required,'" *id.* at 1339, the court found a materially false statement to the Patent Office and granted summary judgment of inequitable conduct:

> In certifying that IMS's non-payment was "unintentional," Mr. Bailey represented to the PTO that he knew that to be true. ***In reality, however, Mr. Bailey lacked any knowledge of why IMS did not pay the maintenance fee . . . . In that sense, Mr. Bailey's certification was a misrepresentation because it represented that he knew something he did not***.

*Id.* at 1337 (emphasis added); *accord, e.g., Lumenyte*, 92 F.3d 1206, at \*4.[8]

---

[8] Relying upon the *Asghari* opinion, XR also argues Mr. Schwedler and Mr. Burke could not have violated their duty to investigate because the "reasonable diligence" standard is

1   XR's own Patent Office expert, Ms. Teresa Rea, conceded that, other than the public

2   file history, there was no evidence in the record that Mr. Schwedler or Mr. Burke had access

3   to other information concerning the reasons the application had been abandoned. D-SUF ¶

4   67. Similarly, while she "assumed" that Mr. Schwedler spoke with other individuals such

5   as Mr. Sidley, Ms. Rea acknowledged that "the only certain person" the record showed he

6   had spoken to was a corporate lawyer at Mr. Schwedler's firm, with no information about

7   what they talked about. D-SUF ¶ 68. Ms. Rea further conceded that the record showed that

8   neither Mr. Burke nor Mr. Schwedler recalled speaking with each other or with Mr. Brooks,

9   Mr. Haycox, Mr. Sidley, or any of the other individuals set forth above. D-SUF ¶ 69.

10   The record clearly shows that neither Mr. Schwedler nor Mr. Burke ever conducted

11   any verifiable investigation before certifying to the Patent Office that the abandonments

12   were unintentional. Their statements to the Patent Office that the entire period of delay was

13   "unintentional" were thus misrepresentations as a matter of law. *See, e.g.*, *3D Med.*, 228 F.

14   Supp. 3d at 1337; *see also Lumenyte*, 92 F.3d 1206, at *4. This precludes grant of summary

15   judgement in XR's favor.[9]

16

17   _____

18   vague. Dkt. 418 (XR's Motion) at 19. But *Asghari* only proves that Mr. Schwedler's and
     Mr. Burke's investigation was insufficient to the extent they conducted any investigation.

19   In *Asghari*, before filing a first petition stating that the delay was unintentional, the attorney
     through his partner communicated with the inventors and obtained a declaration that the

20   delay was unintentional. Before filing the second petition, the attorney contacted the

21   previous patent agents and attorneys for the plaintiff to investigate the facts and obtain
     additional declarations. *Asghari* clearly suggests that sufficient diligence involves talking

22   to individuals who possess direct knowledge of the facts. Investigation by Mr. Schwedler

23   or by Mr. Burke falls considerably short of the investigation that was deemed reasonable
     in *Asghari*.

24

25   [9] XR's reliance on *Freshub* is to no avail. Dkt. 418 (XR's Motion) at 13. Unlike Mr.
     Schwedler and Mr. Burke, the attorney in *Freshub* had personal knowledge of facts.

26   Similarly, there was no evidence in *Freshub* that application had been deliberately

27   abandoned. Here, unrebutted testimony from Mr. Haycox shows that Mr. Sidley at
     Aequitas Capital deliberately chose to not pay Mr. Brooks, thereby causing him to

28   withdraw as counsel and causing inevitable abandonment of the applications.

### C.   Mr. Schwedler's and Mr. Burke's misrepresentations in the petitions to revive were material.

A misrepresentation or omission is material if, but for the misrepresentation or omission, the Patent Office would not have granted the patent. *See id.* at 1291–93. Here, Mr. Schwedler's and Mr. Burke's representations in filing the petitions to revive the abandoned applications were indisputably material, because the Patent Office would not have revived the abandoned patent applications but for their representations.

*First*, a petition to revive an abandoned patent for unintentional delay ***must*** be accompanied by "[a] statement that the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to this section was unintentional." 37 C.F.R. § 1.137(b)(4). Thus, absent their statements that the delays were unintentional, the Patent Office would not have revived the patent applications, and the asserted patents would never have issued. 37 C.F.R. § 1.137(b)(4).

*Second*, by signing and submitting the petitions, Mr. Schwedler and Mr. Burke also represented to the Patent Office that their contentions that the entire delay was unintentional had evidentiary support based on reasonable inquiry. *See* 37 C.F.R. § 11.18(b)(2)(iii). What's more, as mentioned above, the Office explicitly told Mr. Schwedler and Mr. Burke that it was relying on the statements in their petitions as having been made "as a result of a reasonable inquiry into the facts and circumstances" of the allegedly unintentional delay in granting the petitions. D-SUF ¶¶ 24, 31. Thus, absent their certifications that they had performed such inquiries and concluded that the delays were unintentional, the Patent Office would not have revived the patent applications, and the asserted patents would never have issued.

This satisfies the but-for materiality requirement. *See 3D Med.*, 228 F. Supp. 3d at 1339 (finding "materiality is straightforward" where Patent Office would not have reinstated patent without certification that delay in maintenance fee payment was unintentional); *see also Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.,* 351 F.3d 1139, 1146 (Fed. Cir. 2003) (finding "no serious question" as to materiality because patentee's

representation that it qualified as small entity was "material to the PTO's acceptance of reduced maintenance fees, and thus, survival of the patent.").

### D. Mr. Schwedler and Mr. Burke each had specific intent to deceive the Patent Office.

"[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Therasense*, 649 F.3d at 1290 (quoting *Star Sci. Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Id.* Here, the circumstantial evidence permits only a single inference: Mr. Schwedler and Mr. Burke made their misrepresentations with specific intent to deceive the Patent Office.

#### 1. Mr. Schwedler had specific intent to deceive the Patent Office

*First*, Mr. Schwedler performed no verifiable investigation to determine whether the facts actually supported his sworn representations he made to the Patent Office despite both his duty to do so and explicit directions from the Office to do so. As discussed in Section IV.B above, Mr. Schwedler claims that the alleged investigation consisted of reviewing the file wrappers and speaking to a corporate lawyer at his firm. D-SUF ¶ 76. He did not remember ever speaking to Mr. Brooks, who the file history indicated withdrew from prosecuting the portfolio due to financial disagreements with the client. D-SUF ¶ 22. He did not remember ever speaking to Mr. Ambrose, whose name appeared in the file history as the contact person. D-SUF ¶ 55. Even the Examiner interviewed Mr. Brooks and Mr. Ambrose when enquiring about the circumstances of the abandonment. D-SUF ¶ 32. Mr. Schwedler could have followed the clear leads that were in the file history that he says he reviewed, but did not do so. This inaction is even more egregious because the Office explicitly notified Mr. Schwedler that it was relying on the statements in his petitions as having been made "as a result of a reasonable inquiry into the facts and circumstances" of the allegedly unintentional delay. D-SUF ¶¶ 23, 20.

*Second*, Mr. Schwedler knew that Aequitas Capital was financially involved with the prior assignees at the time the applications were abandoned, but did not investigate this further. D-SUF ¶¶ 21, 70. Mr. Schwedler had personal knowledge that Aequitas Capital had loaned money to Vivato Networks as part of its merger with Catcher and had had a lien on the portfolio because he filed the security agreement with the Patent Office in fall of 2007. D-SUF ¶ 70. Mr. Schwedler also had personal knowledge that Aequitas Equipment foreclosed on the portfolio after the applications were allowed to go abandoned because he filed the foreclosure judgment with the Patent Office in summer of 2009, shortly before filing the petitions to revive in fall of 2009.[10] D-SUF ¶ 70. The file history also reflected that Mr. Brooks withdrew from prosecution of the applications for unresolved financial issues relating to the prior owner of the portfolio. SUF ¶ 18; D-SUF ¶ 22. As discussed in Section IV.A. above, many financial and business-based reasons for allowing a patent application to go abandoned are not unintentional abandonments. Yet Mr. Schwedler again chose not to speak to those with direct knowledge of the prior assignee's financial situation.

*Third*, Mr. Schwedler had every motivation to submit the petitions to revive without performing an investigation. Mr. Schwedler testified that he considered his work on the portfolio "a stopgap until [Aequitas] could find other representation." D-SUF ¶ 74. He was also pressured to keep as many of the applications alive until they could be disposed of, but did not have adequate resources. D-SUF ¶ 75. Mr. Schwedler testified that his work for Aequitas after its acquisition of the patent applications was a "rush job," and that "the idea was to keep the balls in the air until they could find out how to dispose of the portfolio."

---

[10] Mr. Schwedler was not certain whether he had conducted any research regarding the law governing abandonment of applications due to non-payment fees associated with prosecution. (SUF ¶ 54). If Mr. Schwedler had conducted such a search, he would have uncovered legal precedent directly contrary to his asserted belief that the facts at the time of the petition were such that the abandonment could be considered unintentional. *See* Section II.C and Section II.D above.

*Id.* He also testified that he knew that a number of the applications had been abandoned, D-SUF ¶ 77, and that he wanted to speak to the inventors to "understand the course of the prosecution." D-SUF ¶¶ 75, 76. He was unable to do so, recalling being frustrated at the time because it may have been because the client did not want to spend the money. D-SUF ¶¶ 75, 76. Despite that frustration, he chose to not conduct a reasonable investigation. In any event, inability to contact inventors does not justify not conducting a fulsome investigation.

### 2. Mr. Burke had specific intent to deceive the Patent Office

*First*, Mr. Burke did not perform a verifiable investigation to determine whether the representation he made was supported by the facts, despite his duty to do so and despite explicit directions from the Office to do so. As discussed in Section IV.B. above, Mr. Burke could not recall what, if anything, he did to investigate the circumstances of the abandonment. D-SUF ¶¶ 57-59. He did not remember ever speaking to either Mr. Brooks or Mr. Ambrose, two individuals that the Patent Office thought were worth contacting when ascertaining why the application was abandoned. D-SUF ¶¶ 32, 61, 62. Mr. Burke could have followed the clear leads that were in the file history especially when he remarked it was his practice to review upon inheriting a pending application, but did not do so. This inaction is extremely inexplicable in light of the fact the Office explicitly warned Mr. Burke that it was relying on the statement in his petition as having been made "as a result of a reasonable inquiry into the facts and circumstances" of the allegedly unintentional delay. D-SUF ¶¶ 23, 30.

*Second*, Mr. Burke was already aware of the abandoned applications based on his work on the Patent Purchase Agreement between Aequitas and XR and his review of the file histories. D-SUF ¶¶ 26, 71. Mr. Burke testified that when he was hired by XR, he was asked to help acquire patent properties, and was asked to review a draft to effect that transaction. D-SUF ¶ 71. Mr. Burke apparently expended significant effort on the draft. D-SUF ¶ 71. Thus, Mr. Burke must have known that certain patent applications had been

abandoned and sought to be revived by Aequitas. Yet Mr. Burke did nothing to investigate the circumstances of those abandonments or the adequacy of Aequitas's representations.

*Third*, Mr. Burke's actions in filing the renewed petition to revive shows that he at most did the bare minimum based on the paper record and did not perform any verifiable investigation into the relevant facts. D-SUF ¶¶ 26, 27. For example, he was careful to point out in the renewed petition that it was being submitted simply to rectify procedural errors in Mr. Schwedler's prior petitions to revive. *Id.* And Mr. Burke copied the entirety of the prior proposed amendments previously filed by Mr. Schwedler verbatim, simply replacing the signature block with his. *Id.* These facts support the inference that Mr. Burke relied entirely on Mr. Schwedler's paper filings in lieu of conducting his own investigation.

*        *        *

Taken together, the facts show that neither Mr. Schwedler and Mr. Burke conducted any modicum of an investigation and that had they done so, that investigation would have revealed that they had no basis to certify to the Patent Office that the abandonment was unintentional. The only plausible inference that can be drawn from the evidence is that Mr. Schwedler and Mr. Burke intentionally remained ignorant of the facts by failing to perform an investigation prior to certifying in their petitions that the entire delays in responding to the pending office actions were unintentional.

Of course, as patent prosecutors frequently do in response to inequitable conduct allegations, both Mr. Schwedler and Mr. Burke deny having any intent to deceive the Patent Office in certifying that the applications were unintentionally abandoned. But their self-serving claims that they "certainly" did a reasonable investigation into the circumstances of the abandonments, SUF ¶¶ 28-30, or that they do not see any evidence of specific intent to deceive the Patent Office, SUF ¶¶ 32-39, should be disregarded given that their testimony is not supported by any facts and is, in fact, contradicted by testimony from other fact witnesses, none of whom recall ever being contacted by Mr. Schwedler or Mr. Burke about the abandonments.

Contrary to XR's argument, the record here shows that both Mr. Schwedler and Mr.

Burke made their misrepresentations to the Patent Office with specific intent to deceive, as a matter of law. *See, e.g.*, *3D Med.*, 228 F. Supp. 3d at 1337; *see also Lumenyte*, 92 F.3d 1206, at *4. And to the extent that conclusion depends on a predicate issue of credibility of the witnesses, at a minimum XR is not entitled to summary judgment of no inequitable conduct.[11] The evidence plainly shows deceptive intent, and XR has no good faith explanation for Mr. Schwedler's and Mr. Burke's misconduct. *See Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1351 (Fed. Cir. 2013). This warrants denying summary judgment. *Id.*; *see also Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1363–64 (Fed. Cir. 2010).

**E.    XR's proposal would reward those who bury their heads in the sand.**

XR argues that neither of the attorneys "*knew* or *believed*" that the applications were intentionally abandoned" and "were ever informed that the abandonment was intentional." Dkt. 418 (XR's Motion) at 10 (emphasis in original). XR's argument completely ignores the duty to conduct a "reasonable investigation under the circumstances" imposed by the Patent Office when filing a petition to revive. Here, Mr. Schwedler and Mr. Burke had a duty to investigate into the circumstances that led to the abandonments, especially when both lacked "firsthand and direct knowledge" of such circumstances. Both chose to ***not*** investigate in spite of the explicit warning from the Patent Office to do so. If prosecutors could avoid inequitable conduct by simply burying their heads in the sand and checking the "unintentional" box in the petition to revive, as both Mr. Schwedler and Mr. Burke did here, it would encourage applicants and their prosecutors to tactically allow their applications to lapse only to revive them later under the guise of "unintentionality" when

---

[11] XR's reliance on *Pavo Solutions* is misplaced. Dkt. 418 (XR's Motion) at 17. There, the court granted summary judgement of no inequitable conduct because the defendant failed to marshal adequate facts for the intent prong. Here, uncontroverted evidence shows that Catcher and Aequitas Capital were aware that Mr. Brooks may quit if not reimbursed, and that the portfolio would not remain "alive" if that occurred. Yet they chose not to reimburse Mr. Brooks.

it suits their needs. Permitting that gamesmanship would render the inequitable conduct standard meaningless.

**V.      CONCLUSION**

For the reasons set forth above, Defendants respectfully submit that the Court should deny XR's motion for partial summary judgment of no inequitable conduct.

DEFENDANTS' RESPONSE TO XR'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

Dated:  September 12, 2022                    Respectfully submitted,


                                             By: */s/ Anupam Sharma*
                                             Robert T. Haslam (SBN 71134)
                                             rhaslam@cov.com
                                             Anupam Sharma (SBN 229545)
                                             asharma@cov.com
                                             COVINGTON & BURLING LLP
                                             3000 El Camino Real
                                             5 Palo Alto Square, 10th Floor
                                             Palo Alto, CA 94306-2112
                                             Telephone: 650-632-4700
                                             Fax: 650-632-4800

                                             David A. Garr (admitted *pro hac vice*)
                                             dgarr@cov.com
                                             Han Park (admitted *pro hac vice*)
                                             hpark@cov.com
                                             Laura A. Brodkin (admitted *pro hac vice*)
                                             lbrodkin@cov.com
                                             Kee Young Lee (admitted *pro hac vice*)
                                             kylee@cov.com
                                             COVINGTON & BURLING LLP
                                             850 Tenth Street NW
                                             Washington, DC 20001-4956
                                             Telephone: 202-662-6000
                                             Fax: 202-662-6291

                                             J. Hardy Ehlers (SBN 287528)
                                             jehlers@cov.com
                                             COVINGTON & BURLING LLP
                                             1999 Avenue of the Stars, Suite 3500
                                             Los Angeles, CA 90067-4643
                                             Telephone: 424-332-4778
                                             Fax: 424-332-4749

                                             Faye Paul Teller (SBN 343506)
                                             faye.teller@mto.com
                                             Peter E. Gratzinger (SBN 228764)
                                             peter.gratzinger@mto.com

1

MUNGER TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: 213-683-9100

*Attorneys for Defendant Aruba Networks, LLC.*


/s/ Matthew S. Yungwirth
Matthew S. Yungwirth
(admitted *pro hac vice*)
msyungwirth@duanemorris.com
Alice E. Snedeker
(admitted *pro hac vice*)
aesnedeker@duanemorris.com
Sajid Saleem (admitted *pro hac vice*)
ssaleem@duanemorris.com
DUANE MORRIS LLP
1075 Peachtree Street NE, Suite 1700
Atlanta, GA 30309-3929
Telephone: 404-253-6900
Facsimile:  404-253-6901

Daniel B. Heidtke (SBN 302450)
dbheidtke@duanemorris.com
DUANE MORRIS LLP
865 S. Figueroa Street, Ste. 3100
Los Angeles, CA  90017-5450
Telephone:  213.689.7400
Facsimile:  213.689.7401

*Attorneys for Defendants Belkin International, Inc. and NETGEAR, Inc.*


/s/ Harrison J. Frahn IV
Harrison J. Frahn IV (SBN 206822)
hfrahn@stblaw.com
Jonathan C. Sanders (SBN 228785)
jsanders@stblaw.com

2

Bo Jin (SBN 278990)
bryan.jin@stblaw.com
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 251-5000
Facsimile: (650) 251-5002

*Attorneys for Defendant Ubiquiti Inc.*

DEFENDANTS' RESPONSE TO XR'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court for the Central District of California using the CM/ECF System on September 12, 2022. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

Dated:  September 12, 2022          By: */s/ Anupam Sharma*