REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**RUSS AUGUST & KABAT**
Marc A. Fenster, CA SBN 181067
mfenster@raklaw.com
Reza Mirzaie, CA SBN 246953
rmirzaie@raklaw.com
Adam S. Hoffman CA SBN 218740
ahoffman@raklaw.com
Philip X. Wang, CA SBN 262239
pwang@raklaw.com
Minna Y. Chan CA SBN 305941
mchan@raklaw.com
James N. Pickens, CA SBN 307474
jpickens@raklaw.com
Christian Conkle, CA SBN 306374
cconkle@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Tele:      310/826-7474
Fax:       310/826-6991

*Attorneys for Plaintiff*
XR COMMUNICATIONS, LLC
dba VIVATO TECHNOLOGIES

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| XR COMMUNICATIONS, LLC, dba VIVATO TECHNOLOGIES, <br><br> *Plaintiff*, <br><br> *v.* <br><br> D-LINK SYSTEMS, INC., <br><br> *Defendant*. | Case No. 8:17-cv-0596-DOC (LEAD) <br><br> Hon. David O. Carter <br><br> **PLAINTIFF XR COMMUNICATIONS, LLC'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN OPINIONS OF DR. RICHARD WESEL, Ph.D. [Dkt. No. 415]** |

PLAINTIFF'S OPPOSITION TO MOTION TO STRIKE DR. WESEL OPINIONS [DKT. NO. 415]

RUSS, AUGUST & KABAT

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## <u>TABLE OF CONTENTS</u>

I.     Introduction ........................................................................................4

II.    Legal Standard ....................................................................................4

III.   Dr. Wesel's infringement opinions on the '376 Patent are based on sufficient evidence and the Court's claim construction order and should not be stricken. ...............................................................................5

    A.    Although Dr. Wesel disagrees with Defendants' rebuttal experts, his opinions are supported by ample evidence and the jury can determine which expert is correct. ......................................................13

    B.    Defendants, not Dr. Wesel, distort the agreed constructions of peaks and nulls. ...............................................................16

IV.    Dr. Wesel's infringement opinions on the '939 Patent are proper. ........18

    A.    Defendants' attack against a straw man construction of "wireless I/O unit" has no bearing on Dr. Wesel' actual analysis. ...............18

    B.    Dr. Wesel does not accuse third-party components, defeating Defendants' argument that they cannot directly infringe. .............20

    C.    Dr. Wesel's doctrine of equivalents theory is not improper, even under Defendants' misinterpretation of the law ..................21

    D.    No relief should be granted as to Aruba, Belkin, or Ubiquiti in any event, because they provide this court with no evidence regarding Dr. Wesel's opinions. ....................................................23

V.     Conclusion .........................................................................................24

RUSS, AUGUST & KABAT

---

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## **TABLE OF AUTHORITIES**

**Cases**

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
    535 U.S. 722 (2002) ...................................................................................23

*George E. Warren Corp. v. United States*,
    341 F.3d 1348 (Fed.Cir.2003) ...................................................................23

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) .....................................................................5

*Kemco Sales, Inc. v. Control Papers Co., Inc.*,
    208 F.3d 1352 (Fed. Cir. 2000) .................................................................22

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
    324 F.3d 1308 (Fed. Cir. 2003) .................................................................22

*Primiano v. Cook*,
    598 F.3d 558 (9th Cir. 2010) .......................................................................4

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) .................................................................12

RUSS, AUGUST & KABAT

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## I.    Introduction

Defendants NETGEAR, Inc. and Belkin International, Inc., joined by defendant Aruba Networks, LLC, and Ubiquiti Inc. (*see* Dkt. No. 426), (collectively "Defendants") seek to completely exclude the expert testimony of Dr. Richard Wesel on behalf of Plaintiff XR Communications, LLC ("XR") regarding U.S. Patents 10,594,376 (the "'376 Patent") and 8,289,939 (the "'939 Patent").

Defendants fail to show any actual shortcoming in Dr. Wesel's infringement analysis, much less a problem that would justify the complete exclusion of any opinions in his report. In each instance, Defendants overlook the claim language and the actual evidence Dr. Wesel reviewed and analysis he performed, relying instead on hyperbolic and incorrect paraphrase of a handful of statements from his two-day deposition. And at any rate, Defendants mischaracterize Dr. Wesel's supposed understanding of the claim language in an attempt to recast ordinary factual disputes as claim construction issues. In fact, each of these issues is simply a factual dispute between Dr. Wesel and Defendants' experts.

In short, the issues presented in the motion are examples of classic and legitimate "battle of the experts" at trial, not one that is appropriate for any Daubert exclusion. Defendants are free to cross-examine Dr. Wesel at trial with these weak points, if they do not themselves run afoul of this Court's constructions.

## II.    Legal Standard

"Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010) (citation omitted). "[S]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion" *Id.* at 564.  Particularly where disputes are about what evidence the expert should rely on, and what weight to give that evidence, "[i]t is not the district court's role under *Daubert* to evaluate the

PLAINTIFF'S OPPOSITION TO MOTION TO STRIKE DR. WESEL OPINIONS [DKT. NO. 415]

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

correctness of facts underlying an expert's testimony[.]" *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010).

**III.    Dr. Wesel's infringement opinions on the '376 Patent are based on sufficient evidence and the Court's claim construction order and should not be stricken.**

The '376 Patent requires, in relevant part, that an infringing device:

- "*determine where to place transmission peaks* and *transmission nulls* within one or more spatially distributed patterns of electromagnetic signals," and;

- further exhibiting "*a first transmission peak at a location of the first client device* and a *second transmission peak at a location of the second client device*."

Dr. Wesel proved up these elements well beyond a mere preponderance standard. And he did so with a bevy of rock-solid evidence, each independent of one another and standing to confirm his ultimate opinions on how these claim elements are met. This included a combination of rock-solid evidence, including not only the IEEE standards that the Defendants proclaim the accused products comply with, but with industry practice—as well as public *and non-public* documents and sworn testimony from the Defendants themselves.

As Dr. Wesel explains, each of the Netgear products accused of infringement supports a functionality called multi-user multiple input multiple output, or "MU-MIMO," for short. Consistent with the bevy of evidence he cites, MU-MIMO "describes a wireless access point transmitting different spatial streams of data to several targeted clients simultaneously via the smart antenna." Expert Report of Richard Wesel, Ph.D. Regarding Infringement by Netgear, Ex. A ("Wesel Netgear Report") at 38 ¶ 60; *see also id.* at 27-38 ¶¶ 51-59 (evidence of MU-MIMO support by Accused Products).

RUSS, AUGUST & KABAT

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

In his unrebutted opinion, this is only possible because the smart antenna in each Accused Product performs certain digital signal processing and an array of antenna elements to use constructive and destructive interference arising from simultaneous transmissions from a plurality of individual antenna elements. Wesel Netgear Report at 39 ¶ 61; *see also id.* at 39-47 ¶¶ 62-72 (summarizing industry practice regarding MU-MIMO as evidenced in documents from Aruba, Qualcomm, and Cisco). They do so to arrange for the data intended for client A to have a maximum power at the location of client A but a minimum power at the location of client B, whereas the data intended for client B has a maximum at client B and a minimum at client A. This use of constructive and destructive interference is called "beamforming." *Id*.

In addition to many other pieces of unrebutted evidence, Dr. Wesel reviewed and analyzed relevant sections of the IEEE 802.11 standards governing the Accused Products. These which lay the foundation for how the Accused Products can receive the information necessary to perform MU-MIMO beamforming (*i.e.*, via feedback from client devices) and how the Accused Products can actually perform the beamforming operation (*i.e.*, via a spatial mapping block using one or more steering matrix). Wesel Netgear Report at 47-106 ¶¶ 73-147. Through these, Dr. Wesel explained how the 802.11ac amendment enabled the Defendants to create "wave 2" products later-generation products that are, in fact, capable of performing MU-MIMO beamforming, just like Defendants widely advertise. Wesel Netgear Report at 43-44 ¶ 69, 47–75 ¶¶ 74-108.

But he did not stop there. Dr. Wesel then studied which chip specific vendors provide the chipsets that enable relevant portions of the accused functionality in the Defendants accused products. Then he studied their documents that are publicly available *as well as the highly confidential ones* that Vivato obtained through Rule 45 subpoena practice. Some of these chip supplier documents illustrate, for the benefit of this Court and the jury, precisely what MU-MIMO's beamformed signals

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

look like, which leaves any viewer with the inescapable conclusion that the "peaks" and "nulls" limitations at issue are indeed satisfied:



Wesel Netgear Report at 43 (reproduced from "Qualcomm 802.11ac MU-MIMO: Bridging the MIMO Gap").

Indeed, the Wesel Report heavily relies on actual Defendant chip-vendor confidential documents corresponding to the accused products. As just one example, NETGEAR-XR_00029412 (also produced as XR_00012708), is a Qualcomm technical document that says that the Qualcomm chipsets infringe "transmission peaks" and "transmit nulls" in the specific chipsets that are accused of infringement in this case, including the QCA9880 and QCA9882 (consumer), and the QCA9990 and QCA9992 products. *See, e.g.*, Wesel Netgear Report at 305-306; Wesel Aruba Report at 324-325, 352-353.

Again, illustrations like this one do not just illustrate or explain how the MU-MIMO beamforming functionality works in theory. Instead, to quote and snapshot an Aruba document, they illustrate how the accused beamforming functionality in the accused products works "in practice":

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL



**Figure 11** *Beamforming in Practice*

Aruba MU-MIMO Tech Brief, ARUBA_0025823, Ex. B at 18.

Moreover, these same Defendant documents illustrate the difference between the accused products with MU-MIMO beamforming and other unaccused products that are only capable of performing signal transmissions without that beamforming. These differences help graphically show just how much Defendants' accused functionality is specifically designed to actually create and place claimed "peaks" at locations of intended clients and "nulls" for unintended clients:

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

| Aruba's Description of the Signal Transmissions *Without* Beamforming | Aruba's Description of the Signal Transmissions *With* Beamforming |
|---|---|
|  **Figure 8** *Without Beamforming* | **Figure 10** *MU-MIMO with Beamforming* |
| *Id.* at 15 | *Id.* at 17. |

The specific technical details behind how the accused products perform the MU-MIMO beamforming also confirm Wesel's infringement opinions and expose additional fatal flaws in Defendants' motion. As one confidential document puts it, the accused access points ██████████████████████████████████████ ████████████████████████████████████████████████████████ ████████. ████████████████████████ ARUBA_0031694, Ex. C at ARUBA_0031704-06. ██████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████ *Id*. And to quote another page, this process is used in the accused products to "████████████████████████████████████████████████:

RUSS, AUGUST & KABAT

**Beamforming terminology**

- H is the channel matrix that describes the path between transmitter and receiver.
- The result of the channel measurement is a derivation of the *steering matrix - Q.*
- V is the feedback matrix, sent from the beamformee as part of measurement process to derive Q.
- To steer transmissions in a particular direction, a beamformer will subtly alter what is transmitted by each array.

ARUBA_0031703.  And  all  this

:

**Using multiple antennas to steer transmissions**

- All antennas transmit at the same time. As a result, the total transmission radiates in each direction equally.
- The array applies a phase shift to each element so that the element on the right transmits first and the element on the left transmits last. As a result, the transmissions from the array will converge along a different path that is shifted to the left.



(a) No steering matrix applied



(b) Steering matrix

*Id.* at ARUBA_0031704-06. All this obviously also helps further prove the existence of peaks and nulls within spatially distributed patterns of electromagnetic signals *and* locating a first peak at a first intended client device and a second peak at a second intended client device.

As additional infringement documents explain, if the correct weightings of amplitude and phase are chosen through the feedback and steering matrices—as the accused products are indeed designed to—then the "signal strength at the receive antennas is ***maximized in a local peak***."

RUSS, AUGUST & KABAT

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

> If the correct weightings of amplitude and phase are chosen, the signal strength at the receive antennas is maximized in a local peak, which maximizes SNR and hence the sustainable link rate. TxBF can be thought of as directing a beam on a particular receive antenna, but there is no flashlight-like focused beam for 802.11n or 802.11ac devices, as one might expect from a high-gain directional antenna: the broader pattern is likely to be a patchwork rather than a beam.

Aruba White Paper: 802.11ac In-Depth, ARUBA_0000067, Ex. D, at 15.

Likewise, the same process is used to "*steer a null onto the other clients*, so they can successfully receive their own signals. *Id.* at 21. And this process is supported by multiple source code citations to the very 802.11 ac and 802.11 ax chips used in Defendants' accused products. Wesel Netgear Report at 106-114.

All this, of course, is exactly consistent the way the patent expressly uses those industry terms *and the agreed construction* of peaks and nulls. The patent and parties' agreed plain construction wholly undercuts and contradicts Defendants' non-infringement positions on the terms at issue in their motion and in the case.

With respect to the patent's usage of the claimed terms, though only examples of the plain usage of the claim terms at issue, the patent describes the "peak" and "null" claim terms at issue in a manner that is perfectly consistent with Dr. Wesel's evidence and opinions:

> A transmission peak of a directed communication beam **214** occurs in the transmission pattern **300** when a generated and particular amount of energy is directed in a particular direction. ***Transmission peaks are, therefore, associated with the signal path and/or communication beam to a desired receiving*** node, such as another wireless routing device or a wireless client device. In some cases, ***sidelobes to a communication beam may also be considered to represent transmission peak(s).***
>
> ***Conversely, a transmission null (e.g., not a communication beam)*** occurs in the transmission pattern when no transmission of energy occurs in a particular direction, or a relatively insignificant amount of energy is transmitted in a particular direction. ***Thus, a transmission null is associated with a signal path or lack of a communication beam towards an undesired, possibly interfering, device and/or object.***

RUSS, AUGUST & KABAT

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Transmission nulls may also be associated with the intent to maximize power in another direction (i.e., associated with a transmission peak)[.]

'376 Patent, Col. 5, lines 1-21 (emphases added). Indeed, other examples show the placement of local peaks, which present examples that are also consistent with and fully confirm Dr. Wesel's infringement opinions. *See, e.g., id.* at Fig. 15.

And as to the claim construction, as the table below shows, the construction was agreed to be its plain and ordinary usage—one that comports perfectly with Dr. Wesel's infringement evidence and opinions, but contradicts the flawed premises on which Defendants' motion rests.

| Term | Construction |
|---|---|
| "transmission peaks . . . within one or more spatially distributed patterns of electromagnetic signals" <br><br> ('376 Patent, Claims 1, 12, 22, 30, 32) | **"portions of one or more spatially distributed patterns of electromagnetic signals where transmissions of significant energy are selectively directed"** |
| "transmission nulls within one or more spatially distributed patterns of electromagnetic signals" <br><br> ('376 Patent, Claims 1, 8–9, 12, 22, 30, 32) | **"portions of the one or more spatially distributed patterns of electromagnetic signals where transmissions of no or insignificant energy are selectively directed"** |

Thus, one look at the patent specification or the parties agreed construction proves Defendants' arguments are fatally flawed. In fact, as their expert put it in his deposition, the rest on Defendants' unbelievable premise that parties and the patent did not use the terms "peaks" or "nulls" in its plain or ordinary way, even though he also admitted there is no lexicography or disclaimer of those terms in the patent. Deposition Transcript of Kevin Negus, Ph.D., Day 2, Ex. E at 376-79. Respectfully, this does not pass the straight-face test in light of the record above. It instead flies in the face of the parties' agreement, the record, the patent itself. It is also inconsistent with the law. *E.g.*, *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning," and "[t]here are only two exceptions to this general rule: 1)

RUSS, AUGUST & KABAT

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution.") Defendants' motion fails.

### A. Although Dr. Wesel disagrees with Defendants' rebuttal experts, his opinions are supported by ample evidence and the jury can determine which expert is correct.

As described above, Dr. Wesel's infringement opinion regarding Netgear is supported by extensive evidence, including (1) the 802.11 standards themselves; (2) evidence of industry practice and custom regarding MU-MIMO; (3) Netgear's own documents and witness testimony; and (4) source code for most but not all Accused Products.[1] As to some of these issues, there is Defendants want to recast a straightforward conflict between experts into a *Daubert* issue. Defendants are mistaken. Instead of confronting Dr. Wesel's actual opinions, and the evidentiary basis for those opinions, Defendants instead insist that their expert can define exactly what "evidence" is required to understand the operation of the Accused Products. They declare Dr. Wesel's opinion "unreliable" only because he did not conduct the specific steps they and their experts prefer.

In particular, Defendants believe that showing infringement of the '376 Patent requires presentation of source code and a specific algorithm for computing the beamforming steering matrix, called "Q." Defendants do not dispute that the Accused Products use steering matrixes, just as described in the IEEE standards, documents, and witness testimony.[2] And Defendants do not address Dr. Wesel's

---

[1] As to Aruba, Dr. Wesel consulted source code for *all* Accused Products, because Aruba does not have any products with MediaTek chips. Expert Report of Richard Wesel, Ph.D. Regarding Infringement by Aruba, Ex. G ("Wesel Aruba Report") at 32 ¶ 49.

[2] As to Aruba, Dr. Wesel relied on the testimony of Dr. Eldad Perahia, who specifically admitted that Aruba's 802.11ac and 802.11ax products "would determine a set of Q matrices based on the explicit feedback received from clients," and that the "[t]he Q matrices are applied to match to the channel… for

RUSS, AUGUST & KABAT

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

RUSS, AUGUST & KABAT

evidence and analysis why the use of those steering matrixes within the context of the 802.11ac and 802.11ax MU-MIMO system necessarily involves selectively placing peaks and nulls, just as the claim requires. They do not say Dr. Wesel is wrong; they only say that he did not look at specific source code evidence—evidence that was not available to him.

Notably, Defendants share common interests with their suppliers Qualcomm, Broadcom, and MediaTek, and could have obtained and analyzed the supposedly key source code themselves; but Defendants chose not to do so or even attempt to do so. This is not burden shifting. Dr. Wesel presented a full and convincing infringement opinion based on all of the evidence available to him. If Defendants believe that source code would show noninfringement, the appropriate step for them to take would be to present that evidence—and they do not deny that it was within their power to do so.

There is simply no legal or factual support for Defendants' notion that infringement can only be showed through source code. Defendants do not cite a single case for that proposition. Defendants do not, and cannot, point to any limitation in the '376 Patent that requires specific source code or a specific algorithm.

Indeed, Defendants point to no evidence contradicting Dr. Wesel's conclusion that the Accused Products' use of 802.11ac and 802.11ax necessarily involves using steering matrices to create transmission peaks and transmission nulls. Their key "admission" from Dr. Wesel is that the *details* of such steering are implementation specific. Motion at 8:7-10 (citing the rough transcript corresponding to Deposition

conveying the streams to the different clients," confirming Dr. Wesel's opinion that the Accused Products use steering matrixes to place peaks and nulls. Wesel Aruba Report at 118-19. Moreover, Dr. Wesel's analysis of Aruba's documents and witness testimony covers eleven pages, including key admissions from Dr. Eldad Perahia, addressed in footnotes elsewhere in this Opposition but totally absent from the Motion. Wesel Aruba Report at 114-125 ¶¶ 177-190.

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Transcript of Richard Wesel, Day 2 ("Wesel Day 2 Final") at 428:13-18). But the ability of individual implementers to vary the mathematics of the matrix computation does not contradict Dr. Wesel's opinion. Indeed, Dr. Wesel did not testify that the steering matrix is entirely implementation specific. In the immediately preceding Q&A, Dr. Wesel noted that in both single-user MIMO and multiuser MIMO, "the steering matrices steer energy towards and create transmission peaks at the client devices." Wesel Day 2 Final at 428:1-12. And counsel expressly acknowledged that opinion in his next question: "Q And *if we accept what you've just said as true*, you would agree with me that how the accused devices perform the steering is implementation dependent. Correct? A. … [I]t is implementation specific *exactly* how they do it, yes." *Id.* at 428:13-18 (emphasis added).

In other words: accepting the fact that the accused devices perform beamforming and create transmission peaks at client devices using a steering matrix, the algorithmic details are left to Qualcomm, Broadcom, and MediaTek to tweak and optimize. But those algorithmic details are not claimed in the '376 Patent. Defendants are wrong to suggest that Dr. Wesel is uncertain whether the Accused Products perform the step of "determine where to place transmission peaks and transmission nulls within one or more spatially distributed patterns of electromagnetic signal." Rather, the unrebutted evidence shows that the Accused Products, through their performance of 802.11ac or 802.11ax MU-MIMO beamforming using steering matrices, meet this limitation.

The remainder of Defendants' argument essentially consists of attorney statements that Dr. Wesel "assumes" various things; for example, that he "does not identify any… industry practice or custom" showing that WiFi chipsets use steering matrices.[3] Not so. As discussed above, Dr. Wesel extensively discusses industry

---

[3] Dr. Wesel does not, and need not, opine that "steering matrices are used in all WiFi chipsets." Motion at 9:9-10. Only a fraction of the world's WiFi chipsets are

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

practices for beamforming in 802.11ac and 802.11ax, specifically including the use of explicit feedback to steer peaks and nulls towards intended and unintended clients. Wesel Netgear Report at 39-47 ¶¶ 62-72 (summarizing industry practice regarding MU-MIMO as evidenced in documents from Aruba, Qualcomm, and Cisco).[4] Defendants cannot create a lack of evidentiary support simply by failing to cite Dr. Wesel's evidence.

**B.    Defendants, not Dr. Wesel, distort the agreed constructions of peaks and nulls.**

During claim construction, Defendants and XR agreed that the term "transmission peaks… within one or more spatially distributed patterns of electromagnetic signals" means "portions of one or more spatially distributed patterns of electromagnetic signals where transmissions of significant energy are selectively directed"; similarly, "transmission nulls…" refers to "portions of the one or more patterns… where transmissions of no or insignificant energy are selectively directed." Special Master Report and Recommendation on Claim Construction, Dkt. 280 at 6. As described above, Dr. Wesel describes, based on extensive evidence, how the Accused Products direct transmission energy towards certain clients (and away from other clients) intentionally, deliberately, and for a specific purpose: in order to allow simultaneous transmission to multiple clients.

Section IV.B. of Defendants' Motion contains **_no reference_** to Dr. Wesel's actual infringement analysis. Instead, Defendants rely on misstatement and misdirection. The centerpiece of this section is an unexplained, uncited diagram that

---

used in the Accused Products, and there are certainly WiFi chipsets that do not support any of the accused functionality and therefore need not use steering matrices.

[4]  Aruba's witness Dr. Eldad Perahia testified that the Q matrices, as used in the ordinary operation of the Accused Products, are based on the explicit feedback from clients (as described in the 802.11 standards) and that applying the Q matrix "weights" is used in beamforming in the Accused Products. Wesel Aruba Report at 119-20. Aruba, at least, cannot credibly deny the use of steering matrices.

RUSS, AUGUST & KABAT

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Defendants try to suggest is relevant to Dr. Wesel's infringement opinion. Motion at 11. It is not. This image comes from the noninfringement expert report of Netgear's expert Dr. Kevin Negus, who in turn reproduced it from a Netgear data sheet. Expert Report of Kevin Negus, Ph.D. Regarding Noninfringement, Ex. F ("Negus Noninfringement Report") at 42; *see also id.* at 39-41 ¶¶ 70-76. In Dr. Negus's opinion, this diagram shows that "Netgear's Accused Products use antennas designed to provide nominally omnidirectional coverage including in the azimuthal plane." *Id.* at 41 ¶ 76. In other words, this diagram shows the generic ability of a particular Netgear device to perform omnidirectional transmission. It is not an illustration of beamformed transmission, and even Dr. Negus does not suggest so.

Yet during Dr. Wesel's deposition, counsel for Netgear specifically represented that the figure shows "the energy that is being directed to the client for the purpose of communicating with the client," which Dr. Wesel reasonably interpreted to mean that the access point is performing beamforming. Wesel Day 2 Final at 278:19-279:5. This was, at best, an incomplete and improper hypothetical, and at worst a misrepresentation. The figure does not show "energy… directed to the client," and it does not illustrate the beamforming that Dr. Wesel opines on. In particular, the figure does not in any way suggest that, when conducting MU-MIMO in 802.11ac or 802.11ax as accused, the transmission peak would look anything like the figure. The figure should be disregarded.

Defendants' arguments purporting to describe Dr. Wesel's "claim construction" are based on mischaracterizations of his testimony about this misleading figure. They say: "Dr. Wesel opines that any *abnormality* that results in a slightly higher transmission power qualifies as a 'transmission peak'… even *if the transmitter is not intending to place significant energy in that direction*." Motion at 11:28-12:4 (emphasis added). But Dr. Wesel actually said: "The transmitter is *sending as much energy as it can to the client device*, so -- and it's a local maximum. That is a significant amount of energy." Wesel Day 2 Final at 284:13-16.

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Defendants' paraphrase is simply wrong. Nothing in the hypothetical questions posed to Dr. Wesel, and nothing in Dr. Wesel's testimony, in any way suggested that an "abnormal" local maximum in the transmission field would be a transmission peak, but rather that the transmission peak was deliberately placed by a transmitter doing its best to place energy in a specific location.

Indeed, Dr. Wesel specifically clarified earlier in the same line of questioning that his understanding of Defendants' hypothetical was that "the access point is doing beamforming and selectively directing as much energy as it can at a client device located at 120 [degrees], and that's a local maximum which it does appear to be, then I would say that's a transmission peak." Wesel Day 2 Final at 279:21-280:2. Defendants' Motion again simply ignores what Dr. Wesel actually said, instead mischaracterizing this as Dr. Wesel arguing "that anything that is not a null is a peak if it is equal to or larger than the adjacent portion of the signal pattern." Motion at 15:10-11. But in the very deposition testimony cited, Dr. Wesel specifically explains that he also considered the hypothetical fact that the transmitter is beam forming and selectively directing energy towards a client—nothing at all like Defendants' "anything… is a peak" characterization.

In short, Defendants are attacking a straw man. Their argument must be rejected. And in light of this reason and all the other fatal flaws identified above, Defendants' motion must be denied.

**IV.    Dr. Wesel's infringement opinions on the '939 Patent are proper.**

**A.    Defendants' attack against a straw man construction of "wireless I/O unit" has no bearing on Dr. Wesel' actual analysis.**

Defendants have already sought a determination that the term "wireless input/output (I/O) unit" is indefinite, and both the Special Master and the Court have already rejected that argument. Dkt. No. 280 at 38-44 ("[T]he Special Master hereby expressly rejects Defendants' argument that this term is indefinite."); Dkt. No. 312

RUSS, AUGUST & KABAT

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

at 6-8, 14. Section V.A. of their Motion seeks to relitigate claim construction, now arguing that because Dr. Wesel explained that a wireless I/O unit is a structure that transmits wireless signals and receives wireless signals, it is "impermissibly broad[]." Defendants expressly admit that they are rearguing "the same problem that Defendants sought to resolve at claim construction." Mot. at 13:6-7. This is an improper motion for reconsideration and should be rejected on that basis alone.

The core of Defendants' argument seems to be that its counsel, or his dog, or the Earth could be a "wireless I/O unit" under Dr. Wesel's supposed "construction." *See* Motion at 13:2-6. Obviously, Dr. Wesel said nothing of the sort. He said that a wireless I/O unit is "a unit that is capable of transmitting wireless signals and receiving wireless signals… could be a single device, a deployment, anything that transmits wireless signals and receives wireless signals." Wesel Day 2 Final at 351:2-6. But all the related hyperbole and other absurdities aside, Dr. Wesel's testimony is entirely consistent with the Special Master's Report and the Court's ruling that "wireless I/O unit" connotes structure, has a plain and ordinary meaning, and should be construed as "plain meaning." In substance, Defendants object that Dr. Wesel did not insert additional and extraneous words somehow limiting the meaning of "wireless I/O unit," but that is of course not required under a "plain meaning" construction.

In fact, the premises on which Defendants' argument here rests do not comport with the patent claims or the opinions of their own expert. *See, e.g.*, Deposition Transcript of Anthony Acampora, Ph.D, 8/31/2022, at 121:8-19 ("Q: Just focusing on the wireless I/O unit limitation, according to the Court's order…. XR does not need to show an Ethernet switch/router; it's optional, fair? … A: I think that's fair…").

RUSS, AUGUST & KABAT

Case No. 8:17-cv-00596-DOC(LEAD)
**PLAINTIFF'S OPPOSITION TO MOTION TO STRIKE DR. WESEL OPINIONS [DKT. NO. 415]**    19

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**B.    Dr. Wesel does not accuse third-party components, defeating Defendants' argument that they cannot directly infringe.**

Section V.B. of Defendants' Motion appears to argue that Netgear cannot directly infringe the '939 Patent because "the accused wireless input/output units include[] third party routers, switches, cabling, etc." Motion at 14:10-11. But that is not Dr. Wesel's opinion. Rather, Dr. Wesel clearly states that the accused wireless I/O unit does ***not*** include third-party components, as Netgear misstates; rather, in his theory the claimed wireless I/O unit corresponds only to "the ***accused products*** in the deployment." Wesel Netgear Report at 124 ¶ 210 (emphasis added).[5] And Dr. Wesel unambiguously defines the accused products as a particular set of "NETGEAR's… access points, routers, and controllers," absolutely not including third-party routers, switches, cabling, or the like. Wesel Netgear Report at 27 ¶ 50.[6] It is simply not true that Dr. Wesel points to third-party components as part of the wireless I/O unit.

Defendants cite only a single paragraph in support of their mischaracterization of Dr. Wesel's opinion. Motion at 13:23-14:2 (citing Wesel Netgear Report ¶ 191). Defendants state that this excerpt defines the "wireless I/O unit." *Id.* Not so. The term "wireless I/O unit" does not even appear in that paragraph. Wesel Netgear Report ¶ 191.[7] In that paragraph Dr. Wesel is explaining that the Accused Products can function within a "campus deployment" comprising multiple Accused Products. Neither Dr. Wesel nor XR is equating the entire "campus deployment" to the wireless I/O unit or to the accused apparatus as a whole.

---

[5]  For Aruba, *see* Wesel Aruba Report at 133-34 ¶ 213.
[6]  For Aruba, *see* Wesel Aruba Report at 126-27 ¶ 195.
[7]  For Aruba, *see* Wesel Aruba Report at 127 ¶ 196. Aruba's attorney declaration quotes that paragraph without citing it or providing the full context to the Court. Dkt. No. 431 ¶ 4. The declaration states that it is Dr. Wesel's identification of "the wireless input/output unit in accused Aruba products," which is not the case.

RUSS, AUGUST & KABAT

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Here, Netgear sells its customers a set of dozens or even hundreds of wireless access points to provide wireless connectivity to a large area, such as a corporate office or a campus. According to Dr. Wesel, *each access point* is a wireless input/output unit. Wesel Netgear Report at 124 ¶ 211 ("Each '939 Accused Product is a wireless input/output (I/O) unit because every deployment includes access points (APs) that transmit wireless outputs and receives wireless inputs. Both the instantiation of Auto-RRM on the Insight cloud platform managing Insight-managed access points and the instantiation of Auto-RRM on the controller platform managing access points is a wireless input/output unit.…."); *see* '939 patent, 6:54-64.[8]

Further, as Dr. Wesel explains, the "deployment of the access stations for the wireless network comprises "a wireless input/output unit," and can be considered one large wireless input/output unit comprised of a plurality of wireless input/output units, which each establish a plurality of access points corresponding to each radio (2.4 GHz and 5 GHz)." Wesel Netgear Report at 122 ¶ 204.[9]

In none of these theories does Dr. Wesel accuse third-party components. The Accused Products are infringing on their own, making Defendants themselves the direct infringers.

## C. Dr. Wesel's doctrine of equivalents theory is not improper, even under Defendants' misinterpretation of the law.

Defendants argue that Dr. Wesel improperly applies a doctrine of equivalents theory in which he asserts that the Accused Products perform "substantially the same function" as that claimed in the '939 Patent. Motion at 14:25-15:2. In Defendants' view, it is improper to apply the doctrine of equivalents to a means-plus-function claim limitation, and it is necessary to map the Accused Products to the literal function claimed, not to "substantially the same function." Defendants are wrong on

---

[8] For Aruba, *see* Wesel Aruba Report at 135 ¶ 216.
[9] For Aruba, *see* Wesel Aruba Report at 132-33 ¶ 211.

RUSS, AUGUST & KABAT

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

the law—but more importantly, they overlook that Dr. Wesel's attacked DOE theory actually does apply the function exactly as claimed. There is accordingly no defect in the theory, even under Defendants' incorrect legal analysis.

The delineation between literal and DOE infringement of means-plus-function elements is conceptually nuanced. Under section 112, paragraph 6, an accused structure may *literally* infringe if it is either "the same as the disclosed structure or… a section 112, paragraph 6 'equivalent,' i.e., (1) perform the identical function and (2) be otherwise insubstantially different with respect to structure." *Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000). In other words, the scope of literal infringement under § 112 ¶ 6 includes an equivalents analysis similar to the doctrine of equivalents, except that under § 112 ¶ 6 literal infringement the function must be identical, not substantially similar, to the function recited in the claim.

But section 112, paragraph 6 does not displace the actual doctrine of equivalents. The Federal Circuit has expressly stated that even if an accused structure does not literally infringe (*e.g.*, "because it does not perform the identical function"), that structure "may nevertheless still be an 'equivalent' under the doctrine of equivalents" if it "perform[s] *substantially the same function*, in substantially the same way, to achieve substantially the same result, as the disclosed structure." *Id.* (emphasis added). There are other subtle distinctions between literal and DOE infringement for means-plus-function limitations, not relevant here, but the key holding of *Kemco Sales* is that the doctrine of equivalents, as applied to means-plus-function elements, does *not* require showing the identical function. Rather, the Federal Circuit expressly approved an analysis looking to "substantially the same function."

Defendants rely on *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003), for the proposition that the rule of *Kemco Sales* is wrong, and that the doctrine of equivalents is unavailable for means-plus-function

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

claims. *Lockheed* did not so hold. *Lockheed* cited *Kemco Sales* with approval, and gave no indication that the panel intended to overrule that precedent. *Id.* at 1320. More importantly, the three-judge panel of *Lockheed* had no authority to overrule Federal Circuit authority without convening an en banc panel, which it did not do. *George E. Warren Corp. v. United States*, 341 F.3d 1348, 1351–52 (Fed.Cir.2003) ("[T]o overrule a precedent, this court must rule en banc."). The *Lockheed* case was decided on remand from the Supreme Court, but that remand related to the panel's previous decision regarding prosecution history estoppel; the Supreme Court did not invite or authorize a holding that the doctrine of equivalents was totally unavailable for means-plus-function claims. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 535 U.S. 1109 (2002) (granting, vacating, and remanding in light of *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002)).

Perhaps more importantly, this Court need not reach this thorny legal question, because Dr. Wesel actually does map the Accused Products to the literal function as claimed. Defendants fail to identify any actual difference between the function in Dr. Wesel's doctrine of equivalents theory and the claimed function, and there is none. In particular, although Dr. Wesel recites the language "substantially the same function" in his doctrine of equivalents analysis, he then describes the function performed by the Accused Products using the literal claim language. Wesel Netgear Report at 146-47 ¶ 235. There is therefore no flaw in Dr. Wesel's analysis, even under Defendants' flawed legal theory.

**D.    No relief should be granted as to Aruba, Belkin, or Ubiquiti in any event, because they provide this court with no evidence regarding Dr. Wesel's opinions.**

In addition to the datal flaws demonstrated above, the fact that Defendants presented no evidence about Dr. Wesel's Belkin or Ubiquiti infringement reports, suggests that no relief should be granted as to Aruba, Belkin, or Ubiquiti. Dr. Wesel issued separate reports regarding infringement by Netgear, Belkin, Ubiquiti, and

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Aruba respectively, each based on the distinct evidence from each defendant. Only the report regarding Netgear is attached to Defendants' Motion or addressed therein; that report contains no opinions regarding infringement by Aruba, Belkin, or Ubiquiti. Because those separate infringement opinions—and the additional evidence in support thereof—have not been presented or addressed, the Court cannot evaluate Dr. Wesel's opinions about the other parties. In the case of Aruba, this was surely intended, because Aruba submitted a declaration from its counsel describing Dr. Wesel's infringement report instead of simply submitting the report itself. Aruba, Belkin, and Ubiquiti have thereby waived any relief.

The Court should deny the Motion as to Belkin, Ubiquiti, and Aruba for these reasons alone. However, should the Court consider the motion as to those additional parties, XR is including footnotes addressing selected portions of Dr. Wesel's distinct evidence regarding Belkin or Ubiquiti, or Aruba.

## V.    Conclusion

For all the reasons stated above, no part of Dr. Wesel's infringement opinions should be stricken. The Court should either decline to consider any issues regarding Aruba, Belkin, or Ubiquiti, or should expressly reject those parties' request to strike Dr. Wesel's infringement opinions.

DATE: September 12, 2022          Respectfully submitted,

**RUSS AUGUST & KABAT**

By: */s/ Reza Mirzaie*
    Reza Mirzaie
    Marc A. Fenster
    Adam S. Hoffman
    Philip X. Wang
    Jacob R. Buczko
    Minna Y. Chan

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

James Pickens
Christian Conkle

*Attorneys for Plaintiff*
XR COMMUNICATIONS, LLC,
dba VIVATO TECHNOLOGIES

RUSS, AUGUST & KABAT

Case No. 8:17-cv-00596-DOC(LEAD)

**PLAINTIFF'S OPPOSITION TO MOTION TO STRIKE DR. WESEL OPINIONS [DKT. NO. 415]**

25

REDACTED DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I hereby certify that the counsel of record who are deemed to have consented to electronic service are being served on September 12, 2022 with a copy of this document via the Court's ECF system.

*/s/ Reza Mirzaie*
Reza Mirzaie

RUSS, AUGUST & KABAT