**RUSS AUGUST & KABAT**
Marc A. Fenster, CA SBN 181067
mfenster@raklaw.com
Reza Mirzaie, CA SBN 246953
rmirzaie@raklaw.com
Philip X. Wang, CA SBN 262239
pwang@raklaw.com
Christian Conkle, CA SBN 306374
cconkle@raklaw.com
Minna Y. Chan CA SBN 305941
mchan@raklaw.com
James N. Pickens, CA SBN 307474
jpickens@raklaw.com
12424 Wilshire Boulevard, 12th Floor
Los Angeles, California 90025
Tele:     310/826-7474
Fax:     310/826-6991

*Attorneys for Plaintiff*
XR COMMUNICATIONS, LLC
dba VIVATO TECHNOLOGIES

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| XR COMMUNICATIONS, LLC, dba VIVATO TECHNOLOGIES, <br><br>*Plaintiff*, <br><br>v. <br><br>D-LINK SYSTEMS, INC., <br><br>*Defendant*. | Case No. 8:17-cv-0596-DOC (LEAD) <br><br> Hon. David O. Carter <br><br> **PLAINTIFF XR'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT** |

## TABLE OF CONTENTS

I. Introduction ...............................................................................................1

II. The Applications Were Unintentionally Abandoned .......................................2

    A. Intentional abandonment requires a *deliberate decision* to abandon an application or permit the application to become abandoned. ......2

    B. There is no evidence that Sidley (at Aequitas Capital) "deliberately chose" to abandon the '329, '342, and '860 applications..........3

    C. Defendants' cases on intentional abandonment are inapposite and underscore the lack of evidence here. .....................................5

    D. Defendants cannot prove that the applications were intentionally abandoned by clear and convincing evidence............................6

III. Schwedler and Burke Made Reasonable Inquiries and There Is No Evidence They Acted with the Specific Intent to Deceive the PTO ...............7

    A. Schwedler and Burke performed reasonable investigations and Defendants' criticisms lack merit......................................8

    B. Compelling authority shows that an alleged violation of the duty of "reasonable inquiry" is insufficient to show inequitable conduct. ...11

    C. There is no evidence that Schwedler and Burke submitted revival petitions with the specific intent to deceive the PTO........................15

IV. Conclusion...............................................................................................16

i

**PLAINTIFF XR'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT**     Case No. 8:17-cv-00596-DOC

RUSS, AUGUST & KABAT

# TABLE OF AUTHORITIES

**Cases**

*3D Medical Imaging Sys., LLC v. Visage Imaging, Inc.*,
　228 F. Supp. 3d 1331 (N.D. Ga. 2017) ..................................................................11

*Freshub, Inc., et al. v. Amazon.com, Inc., et al*,
　6:21-CV-00511-ADA, Dkt. 274 (W.D. Tex. Aug. 2, 2021) .................6, 7, 12

*In re Application of Cheol Kim*,
　09/254,058, 2009 WL 1212054 (P.T.O. Apr. 1, 2009) ...................................5

*In re Maldague*,
　10 USPQ2d 1477 (Comm'r Pat. 1988) ..........................................................6

*In re Rembrandt Technologies LP Patent Litigation*,
　899 F. 3d 1254 (Fed. Cir. 2018) ...................................................................11

*Lumenyte Int'l Corp. v. Cable Lite Corp*,
　92 F.3d 1206, 1996 WL 383927 (Fed. Cir. 1996) ....................................5, 11

*Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*,
　731 F.3d 1239 (Fed. Cir. 2013) ....................................................................11

*Therasense, Inc. v. Becton, Dickinson & Co.*,
　649 F.3d 1276 (Fed. Cir. 2011) ....................................................................10

**Statutes**

37 CFR § 11.18(b)(2) ..................................................................................................9

MPEP § 711.03(c)(3)(II)(C) ...................................................................................2, 3

**Rules**

37 C.F.R. 1.137 .........................................................................................................2

ii

**PLAINTIFF XR'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT**　　　Case No. 8:17-cv-00596-DOC

Russ, August & Kabat

## I. Introduction

XR is entitled to summary judgment of no inequitable conduct for multiple, dispositive reasons. There is insufficient evidence that the '329, '342, and '860 applications were intentionally abandoned." It is undisputed that intentional abandonment requires *a deliberate decision* by the applicant to abandon an application or permit an application to become abandoned. And in every case that has found intentional abandonment, there has been direct, compelling evidence of such a deliberate decision. There is no such evidence here. Indeed, Defendants did not seek or obtain any discovery from the person (Thomas Sidley) or entity (Aequitas) they contend deliberately abandoned the applications.

Defendants also concede that their theory for inequitable conduct boils down to the assertion that (1) Schwedler and Burke failed to make a sufficiently "reasonable inquiry" into the circumstances of abandonment, and that (2) this alleged failure to do enough inquiry alone compels—as the only reasonable inference—a specific intent to deceive the PTO. But the record contains substantial, unrebutted evidence that Schwedler and Burke each conducted a reasonable inquiry into the circumstances of abandonment and justifiably believed—*and still believe to this day*—that the applications were eligible to be revived based on unintentional delay. Further, there is no sufficient evidence that Schwedler and Burke's inquiries were so deficient or non-existent as to constitute a specific intent to deceive the PTO. Defendants' litigation-driven attorney arguments cannot make up for the lack of evidence of deceitful intent anywhere in the record.

Defendants fare no better on the law. To support their inequitable conduct theory, Defendants' only authority continues to be a inapposite Georgia. Defendants at most allege that Schwedler and Burke acted negligently (because they "should have" done more investigation). But *Therasense* held that negligence—or even gross negligence—is insufficient. Indeed, compelling authority demonstrates that Defendants' theory fails as matter of law.

1

## II. The Applications Were Unintentionally Abandoned

As an initial matter, and independently supporting summary judgment of no inequitable conduct, there is insufficient evidence that the '329, '342, and '860 applications were intentionally abandoned. Thus, there is insufficient evidence that Schwedler and Burke's certifications regarding unintentional abandonment were "false." It is undisputed that intentional abandonment requires *a deliberate decision* by the applicant to abandon an application or permit an application to become abandoned. And in every case that has found intentional abandonment, there has been direct, compelling evidence of such a deliberate decision. There is no such evidence here. Indeed, Defendants did not seek or obtain any discovery from the person (Thomas Sidley) or entity (Aequitas) they contend deliberately abandoned the applications. This is fatal to Defendants' argument and alone demonstrates they cannot prove intentional abandonment by clear and convincing evidence.

### A. Intentional abandonment requires a *deliberate decision* to abandon an application or permit the application to become abandoned.

Under PTO regulations, abandonment is intentional only if the applicant "deliberately permits" an application to become abandoned, i.e., the abandonment was a "deliberately chosen course of action":

> *Where the applicant deliberately permits an application to become abandoned* (e.g., due to a conclusion that the claims are unpatentable, that a rejection in an Office action cannot be overcome, or that the invention lacks sufficient commercial value to justify continued prosecution), the abandonment of such application is considered to be *a deliberately chosen course of action*, and the resulting delay cannot be considered as "unintentional" within the meaning of § 1.137 (b).

37 C.F.R. 1.137; MPEP § 711.03(c)(3)(II)(C).[1]

Contrary to Defendants' implication, the MPEP never states that abandonment is intentional when it "results from" a failure to pay prosecution

---

[1] All emphasis added unless otherwise noted.

expenses. *See* Resp. at 8. Rather, it states that where a delay results from "a deliberately chosen course of action," such an intentional delay does not become "unintentional" because the applicant, for example, sought to defer patent prosecution expense. MPEP § 711.03(c)(3)(II)(C) (giving five examples of rationales that are insufficient to change intentional delay into unintentional delay). This is because "a change in circumstances that occurred subsequent to the abandonment of an application does not render 'unintentional' the delay resulting ***from a previous deliberate decision*** to permit an application to be abandoned." *Id.*

But in all instances, and as the MPEP states, there must be "a previous deliberate decision" to abandon the application in the first place. An affirmative, deliberate decision is always required.

### B. There is no evidence that Sidley (at Aequitas Capital) "deliberately chose" to abandon the '329, '342, and '860 applications.

Defendants assert that the applications were intentionally abandoned because Thomas Sidley, manager at Aequitas Capital, "made a deliberate decision in Q1 2008 to not fund the prosecution when it chose not to reimburse Mr. Brooks leading to eventual abandonment of the applications." Resp. at 7, 8 ("The Aequitas entities, through their manager Mr. Sidley, first deliberately abandoned the applications when they decided not to reimburse Mr. Brooks[.]"). Thus, Defendants' argument rests on the state of mind and intent of Sidley in the first quarter of 2008.

But there is no evidence in the record of Sidley's state of mind or intent. And there is certainly no evidence of Sidley's state of mind or intent regarding the '329, '342, and '860 applications in the first quarter of 2008. This is because Defendants never sought or obtained any discovery from Sidley, any Aequitas entity, or any Aequitas employee in this case. SUF 40 ("Undisputed"). As a result, there is not a single document, communication, or piece of testimony that reflects a deliberate decision by Sidley to abandon the '329, '342, and '860 applications. If there were,

3

PLAINTIFF XR'S REPLY IN SUPPORT OF ITS MOTION FOR      Case No. 8:17-cv-00596-DOC
PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

one would expect it to feature prominently on page one of Defendants' brief. The lack of such evidence—and Defendants' failure to pursue it—is telling.

Even based on this incomplete record, many undisputed facts undermine Defendants' theory that Sidley made a deliberate decision to abandon the applications in the first quarter of 2008. *First*, the Office Action rejections that resulted in the abandonments issued from mid-March to late-April 2008. SUF- 20–21, D-SUF 4–5. That period coincided of Catcher's collapse (by April 1) and Brooks's notices of withdrawal (on April 25). SUP-17–18. And there is no evidence Sidley knew of the Office Actions or knew the applications would go abandoned in June-July 2008 if responses were not submitted within three months. In fact, no abandonment issue existed before the Office Actions because the PTO may well have allowed the claims. Thus, *no one* could have "intended" to abandon the applications before April 3, 2008.

*Second*, Defendants assert that Brooks had not been paid prosecution fees for "nearly a year" when he sought to withdraw from prosecution. Resp. at 8; D-SUF 48–50. This is inconsistent with their assertion that Sidley chose to "not fund prosecution" or "not pay Brooks" in Q1 2008. Thus, by Defendants' own account, any decision to stop paying Brooks was made in early 2007, and there was no change in his payment status thereafter. These circumstances do not reflect a deliberate decision to stop funding prosecution of specific applications in Q1 2008.

*Third*, in early 2008, Vivato Networks Holdings was the applicant/assignee of the applications, and Catcher Holdings held the exclusive right to prosecute the applications. D-SUF 12–14. Thus, it is unclear whether Sidley/Aequitas's "intent" is even relevant or could constitute intentional abandonment. Nor is there any evidence of Aequitas's intent to abandon. When Aequitas later sold the portfolio to XR, it represented in the purchase agreement that the applications were revived "in accordance with the applicable rules and procedures of the USPTO." D-SUF 16.

4

*Fourth*, to the extent Sidley/Aequitas's intent is relevant, the circumstances show they acted with extreme diligence in reviving the applications. From January to April 2008, Vivato Networks went into default and Catcher collapsed and ceased doing business. And on June 20—simultaneous with or before the applications went abandoned—Aequitas initiated foreclosure proceedings against Vivato Networks. SUF 19–21. The ownership and prosecution responsibility of the applications was thus in limbo. Over the next year, Aequitas diligently pursued foreclosure proceedings and, in June 2008, purchased the applications in a sheriff's sale. SUF 22–24. Aequitas then filed petitions to revive within a few months of obtaining ownership of the applications. SUF 25.

### C. Defendants' cases on intentional abandonment are inapposite and underscore the lack of evidence here.

None of Defendants' cited cases support their assertion that when a prosecutor withdraws because of payment issues, any subsequent abandonment is considered intentional. Resp. at 6–8. Rather, those cases (and every case XR is aware of that found intentional abandonment) involved direct, compelling evidence that the applicant made a deliberate decision to permit abandonment:

- In *Lumenyte Int'l Corp. v. Cable Lite Corp*, there were five buckets of documents and evidence that showed the applicant knew of the response deadline and deliberately permitted the application to go abandoned given a perceived lack of value. 92 F.3d 1206, 1996 WL 383927, at *2 (Fed. Cir. 1996) (unpublished). A contemporaneous letter stated that the applicant informed the prosecutor to stop working because "he has decided not to spend any additional prosecuting the above referenced patent application and that it was his desire to not respond to the outstanding office action[.]" *Id.*

- In *In re Application of Cheol Kim*, there was extensive documentary evidence of a deliberate course of action to permit abandonment of the specific application at issue. 09/254,058, 2009 WL 1212054, at *3 (P.T.O. Apr. 1, 2009). The applicant was expressly instructed by the prosecutor that the application would go abandoned and allowed it to

do so. *Id.* The applicant also filed a sworn declaration stating, "I gave up the proceeding of the application," which the PTO relied on as showing a deliberate decision to abandon the application. *Id.*

- In *In re Maldague*, the applicant could find no flaws in an office action rejection and thus concluded that "there was no possibility of defending against it." 10 USPQ2d 1477, 1478 (Comm'r Pat. 1988). The applicant thus deliberately chose not to file a response and deliberately allowed the application to become abandoned. *Id.* The applicant later determined that the invention could be distinguished from the references in a "subtle" way, but that did not change the applicant's deliberate abandonment into an unavoidable or unintentional one. *Id.*

In sharp contrast to all these cases, there is no evidence here that Sidley: (a) *knew* of the office action rejections in the '329, '342, and '860 applications that issued in March-April 2008; (b) *knew* the applications would go abandoned if those office actions weren't responded to; and (c) then *made a deliberate decision* to permit the applications to go abandoned. There is not even any evidence that Sidley knew of '329, '342, and '860 applications or realized they could go abandoned. No case has found intentional abandonment under these circumstances.

### D. Defendants cannot prove that the applications were intentionally abandoned by clear and convincing evidence.

The *Freshub* case cited in XR's brief is instructive because Defendants agree that "there was no evidence in *Freshub* that the application had been deliberately abandoned." Resp. at 16, n. 9; *Freshub, Inc., et al. v. Amazon.com, Inc., et al*, 6:21-CV-00511-ADA, Dkt. 274 (W.D. Tex. Aug. 2, 2021) (attached as Ex. A). But there is even less evidence here, and *Freshub* confirms that Defendants cannot prove intentional abandonment by clear and convincing evidence.

In *Freshub*, the '291 application was abandoned for *more than five years*, and there was evidence that the office action rejection and notice of abandonment were forwarded to the applicant five years before revival. *Id.* at 4–5. Further, the applicant executed an agreement in the first year of the five-year period that listed the '291

RUSS, AUGUST & KABAT

application as abandoned. *Id.* Nevertheless, the court found insufficient evidence to show that the representation of unintentional delay for "the entire five- year delay in responding to the PTO's last rejection" was false. *Id.* at 6. This was because none of the evidence "amount[ed] to clear and convincing evidence that [the applicant] Ikan made a deliberate decision to abandon the '291 application." *Id.* at 10. "Given the lack of evidence and [defendant] Amazon's high burden of proof," the court found, Amazon failed to show that the '291 application was intentionally abandoned. *Id.* Thus, "Amazon has not shown by clear and convincing evidence that Ikan made a representation to the PTO in revived the '291 application." *Id.*

The same outcome applies here, except that the period of delay was far shorter than five-years (and perhaps only a couple months, given Defendants' focus on the first quarter of 2008). Further, unlike in *Freshub*, the circumstances here involved a complex history, with many prior owners/assignees of the applications, as well as a bankruptcy and foreclosure proceedings that coincided with office action rejections that resulted in the abandonments at issue. And where Defendants failed to even seek discovery from Sidley or Aequitas, they cannot prove that Sidley made a deliberate decision to abandon the '329, '342, and '860 applications.

### III. Schwedler and Burke Made Reasonable Inquiries and There Is No Evidence They Acted with the Specific Intent to Deceive the PTO

Defendants concede that their theory for inequitable conduct boils down to the assertion that (1) Schwedler and Burke failed to make a sufficiently "reasonable inquiry" into the circumstances of abandonment, and that (2) this alleged failure to do enough inquiry alone compels—as the only reasonable inference—a specific intent to deceive the PTO. Indeed, Defendants do not respond to XR's "Statement of the Issues to Be Decided" or provide a counter statement. Thus, Defendants agree that XR's statement is accurate and that the Court needs to decide:

- Whether, as a matter of law, a prosecutor's alleged violation of the duty of "reasonable inquiry" for statements made in a paper under 37 CFR §

7

- 11.18(b)(2) is sufficient to prove, by clear and convincing evidence, the specific intent to deceive the PTO under *Therasense*.

- Whether Defendants can meet their burden to prove, by clear and convincing evidence, that (a) prosecutors Schwedler and Burke failed to conduct a reasonable inquiry into the circumstances of abandonment and (b) their inquiry was so deficient or non-existent as to constitute the specific intent to deceive the PTO under *Therasense*.

XR Memo (Dkt. 418) at 2 (Stmt. of Issues 2–3).

The answer to both questions is "no." The record contains substantial, unrebutted evidence that Schwedler and Burke each conducted a reasonable inquiry into the circumstances of abandonment and justifiably believed—*and still believe to this day*—that the applications were eligible to be revived based on unintentional delay. Further, there is no sufficient evidence that Schwedler and Burke's inquiries were so deficient or non-existent as to constitute a specific intent to deceive the PTO. Defendants' litigation-driven attorney arguments cannot make up for the lack of evidence of deceitful intent anywhere in the record.

Defendants fare no better on the law. To support their novel inequitable conduct theory, Defendants' only authority continues to be a Georgia case that is (1) wholly distinguishable on the facts, and (2) wrongly decided. Defendants at most allege that Schwedler and Burke acted negligently (because they "should have" done more investigation). But *Therasense* held that negligence—or even gross negligence—is insufficient. Indeed, compelling authority demonstrates that Defendants' theory fails as matter of law.

A. **Schwedler and Burke performed reasonable investigations and Defendants' criticisms lack merit.**

As explained in XR's opening brief, Schwedler and Burke each provided credible, unrebutted testimony that they performed a reasonable investigation before submitting the revival petitions. XR Memo at 14–15; SUF 26–29. Each testified in detail about the reasonable investigation they performed or would have performed.

8

*Id.* Defendants ask the Court to disregard this testimony but provide no basis for doing so. None of Defendants' criticisms have merit.

*First*, Defendants incorrectly *assume* that the applications were intentionally abandoned and try to use that as affirmative evidence that a reasonable inquiry was *not* conducted. Resp. at 10 (asserting that "Had any investigation been performed at all, Mr. Schwedler would have uncovered facts directly contrary to his representations."). This fails. Whether an attorney made a reasonable inquiry into a statement in a paper under 37 CFR § 11.18(b)(2) is a separate question/requirement from whether the statement, based on perfect information, is true.

Further, the applications *were* unintentionally abandoned, as discussed above, so there were no "directly contrary" facts to be uncovered. Tellingly, every relevant witness—including Brooks and Haycox—testified to their understanding that any abandonment was unintentional. XR Memo at 10–11, SUF 9–10, 14–15. Defendants themselves fail to identify any "directly contrary facts" (other than speculating it is in the mind of a person, Sidley, they failed to subpoena or depose). Likewise, consulting the MPEP or relevant cases would only further support a conclusion the applications were unintentionally abandoned. Defendants misinterpret those cases, which involve direct, compelling evidence of a deliberate decision to abandon.

*Second*, Defendants have no basis to assert that Schwedler and Brooks conducted no investigation into the circumstances of abandonment. Thus, Defendants resort to a qualifier and repeatedly assert that Schwedler and Brooks conducted "no **verifiable** investigation." The phrase *verifiable investigation* appears eight times across eight pages of Defendants' brief. *See* Resp. at 2, 7, 10, 14, 16, 18, 20, 21. This is meritless. No court has disregarded an actor's sworn testimony regarding his or own actions simply because of a lack of "verification" (whatever that means). Defendants' argument is also pernicious because it would appear to reverse the burden to prove inequitable conduct by clear and convincing evidence.

RUSS, AUGUST & KABAT

9

**PLAINTIFF XR'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT**   Case No. 8:17-cv-00596-DOC

*Therasense* makes clear that "[b]ecause the party alleging inequitable conduct bears the burden of proof, the patentee need not offer any good faith explanation unless the accused infringer first proves a threshold level of intent to deceive by clear and convincing evidence." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011) (*en banc*). Here, Defendants fell far short of their threshold burden to show deceptive intent. Unlike cases that have found inequitable conduct, there is no evidence that Schwedler and Burke made *knowing* and *deliberate* misrepresentations to the PTO. And even though Schwedler and Burke were not required to, they provided a good faith explanation through credible and detailed testimony. There is no basis to disregard their sworn testimony while accepting Defendants' attorney arguments and unfounded characterizations.

*Third*, Defendants' arguments that Schwedler and Burke might have done more (Resp. at 14–17) fails to show they clearly and convincingly violated "the duty of reasonable inquiry." There is no *per se* requirement to interview witnesses with firsthand or direct knowledge—nor did the PTO say that. Instead, Schwedler and Burke had to inquire into the *facts and circumstances* of the delay, which is what they did. The undisputed facts fully support a finding of reasonableness here.

At a minimum and in addition to other inquiries, Schwedler obtained the facts he needed from his Bullivant colleague *who brought in the client* and was the managing partner of the case. And Burke advised XR in acquiring the portfolio, including substantively drafting the patent purchase agreement in which Aequitas represented that the applications were revived "in accordance with the applicable rules and procedures of the USPTO." D-SUF 16. Burke also had full access to XR's personnel, having worked with on both patent acquisition and prosecution.

Finally, Defendants insist that Schwedler and Burke committed inequitable conduct because they allegedly failed to speak to "the fact witnesses possessing direct, personal knowledge of the circumstances of abandonment[.]" Resp. at 15. This argument is both unsupported and ironic. Under Defendants' own theory of

10

unintentional abandonment, only one fact witness in the entire case has "direct, personal knowledge" of the circumstances of abandonment. That is Mr. Thomas Sidley of Aequitas—the one person who Defendants contend deliberately abandoned the applications sometime in Q1 2008. But Defendants themselves have never spoken to Sidley, and there is no indication that they tried to. Thus, under Defendants' own argument, they themselves failed to make a reasonable inquiry into the circumstances of abandonment.

### B. Compelling authority shows that an alleged violation of the duty of "reasonable inquiry" is insufficient to show inequitable conduct.

As demonstrated in XR's opening brief—and Defendants do not dispute—cases finding inequitable conduct involve situations where there was direct, compelling evidence that the prosecutor **knew** that applications were intentionally abandoned but nevertheless said the opposite to the PTO. XR Memo at 18, n. 4 (citing *In re Rembrandt Technologies LP Patent Litigation*, 899 F. 3d 1254, 1274 (Fed. Cir. 2018));[2] *Lumenyte*, 1996 WL 383927, at *2 (Fed. Cir. 1996)). Those cases are distinguishable because there is no evidence here that Schwedler or Burke *knew* or *believed* that their statements in the revival petitions were false. *Id.* at 10–11. Defendants do not appear to dispute that either.

Defendants again rely on *3D Medical* as the only case that allegedly supports their inequitable conduct theory. *3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331 (N.D. Ga. 2017); Resp. at 15. But in *3D Medical*, the

---

[2] Indeed, *Rembrandt* reiterated the Federal Circuit's holding in *Network Signatures* that a patentee's representation of unintentional delay under standard PTO procedures "does not provide clear and convincing evidence of withholding of material information with the intent to deceive the Director." 899 F.3d at 1275 (quoting *Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1243 (Fed. Cir. 2013)). The *Rembrandt* court distinguished *Network Signatures* on only one basis: the district court in *Rembrandt* had found "that the same people who deceived the PTO were involved in a variety of other misconduct." *Id.* 1275. Here, there is no evidence that Schwedler and Burke were "involved in a variety of other misconduct," further demonstrating the lack of deceptive intent here.

court's ruling was expressly based on its many findings that the prosecutor, Mr. Bailey, *had not investigated* and *had no idea* whether his representations to the PTO were true. *Id.* at 1337–39. The court emphasized that point least four times in its decision. *Id.* at 1337("Nor did he conduct *any investigation*[.]"), 1337 ("Mr. Bailey submitted the Petition *without any idea* of whether his certification was true."), 1339 ("Mr. Bailey admitted during his deposition that, when he submitted the Petition, *he did not know* whether IMS's non-payment was unintentional."), 1339 ("He also admitted that *he had not investigated* that question.").

Thus, *3D Medical* might, at most, support an argument for inequitable conduct where the prosecutor conducts **no** investigation, has **no** knowledge, and has **no** idea whether his representations are true. But those are facts are entirely absent here, where Schwedler and Burke repeatedly testified that they conducted an investigation, had knowledge that the abandonments were unintentional, and believed their representations to be true (both at the time and until today).

Further, as XR explained, *3D Medical* is wrongly decided and inconsistent with *Therasense*. XR Memo at 19. Defendants barely mention *Therasense* in their brief. This is because they cannot reconcile their inequitable conduct theory with *Therasense*'s express holding that an omission that "amounts to gross negligence or negligence under a 'should have known' standard does not satisfy" the requirement to prove specific intent to deceive. *Therasense, Inc. v. Becton, Dickinson* and Co., 649 F.3d 1276, 1290–91 (Fed. Cir. 2011).

In addition to *Therasense*, compelling district court authority contradicts Defendants' theory that a prosecutor's inadequate investigation can constitute inequitable conduct. *Freshub* is particularly instructive and Defendants' attempts to distinguish it are unavailing. *Freshub, Inc., et al. v. Amazon.com, Inc., et al*, 6:21-CV-00511-ADA, Dkt. 274 (W.D. Tex. Aug. 2, 2021).

In *Freshub*, the '291 application was abandoned for more than five years. *Id.* at 6. The prosecutor, Mr. Weiss, made a sworn statement that the entire five-year

12

delay in responding to the PTO's last office action rejection was unintentional. *Id.* (Findings of Fact 19). Mr. Weiss knew he was required to investigate the abandonment before requesting revival of the '291 application. *Id.* (FF 20). "Mr. Weiss could not identify specific actions he took to investigate the abandonment of the '291 application other than looking at his firm's docketing system." *Id.* (FF 21). In granting the petition to revive, the PTO noted that the application "has been abandoned for an extended period of time," and noted it was relying on the prosecutor's duty of candor and good faith in representing that the entire five-year delay was unintentional. *Id.* at 7 (FF 23). The PTO also reminded Mr. Weiss to inquire into the underlying facts and circumstances of abandonment. *Id.* (FF 24).

Despite these findings, the court held that defendant Amazon failed to prove intent to deceive as a matter of law. *Id.* at 11–12. This was because, as the court held, "Amazon does not provide any direct evidence that Ikan possessed a specific intent to deceive the PTO in reviving the '291 application." *Id.* at 11. This was true even though Mr. Weiss *could not identify any actions* he took to investigate the abandonment of the '291 application "other than looking at his firm's docketing system." *Id.* at 11, 6. The court held that even where Mr. Weiss, presumably did *no investigation* into a five-year period of delay other than looking at his firm's docket, that "at most" indicated negligence. *Id.* Thus, under *Therasense*, intent to deceive was not the "single most reasonable inference" and could *not* be found.

The facts here are similar, except the period of abandonment was much shorter than five years, and Schwedler and Burke did far more investigation than merely "looking at the [] firm docket." Further, far more evidence here indicates that the applications were unintentionally abandoned, and Schwedler and Burke both testified to knowing or investigating that evidence (including circumstances relating to Catcher's collapse and Aequitas's foreclosure proceedings). Indeed, even a cursory comparison to the facts of *Freshub* demonstrates that there is no basis to infer deceptive intent in this case.

13

*Asghari-Kamrani v. USAA* is also instructive, both on the facts and because it analyzes and distinguishes *3D Medical* as a matter of law. 252 F. Supp. 3d 562, 583–84 (E.D. Va. 2017). Defendants mischaracterize the case and their discussion of it is unreliable. In *Asghari*, the applicants made false representations concerning a priority claim and their only investigation was "reviewing the relevant files." *Id.* at 583. They testified that they "did not feel that there was any need to contact or question their past attorneys regarding whether this type of priority claim was the result of an unintentional delay." *Id.* The court found that this explanation was sufficient and plausible and therefore could not find inequitable conduct.

The court distinguished *3D Medical* on the basis that the applicants testified that "they *did* conduct an investigation to determine if there was a reason as to whether the delay was intentional or unintentional, and therefore whether their certification of unintentional delay was true." *Id.* at 584. Therefore, the dispositive fact was that the applicants did conduct "some" investigation and that alone undermined any intent to deceive. Notably, the court did not purport to assess the applicants' investigation under the amorphous "reasonable inquiry" standard. Rather, even if the applicants' investigation allegedly fell short, it was sufficient for purposes of assessing inequitable conduct.

*Asghari-Kamrani* also assessed and rejected a separate claim of inequitable conduct. *Id.* at 584–86. In doing so, the court held that "where [the prosecutor] Mr. Kim had conducted an investigation or relied on the investigation of his law partner and had at least *some* idea that the certification he was making was true, intent to deceive [was] not the single most reasonable inference[]." *Id.* at 586 (emphasis in original). Thus, the court held that it is entirely reasonable to rely on the investigation of a colleague, as long as a prosecutor has "some idea" that the certification being made is true. These holdings further undermine Defendants' allegations regarding inequitable conduct here.

### C. There is no evidence that Schwedler and Burke submitted revival petitions with the specific intent to deceive the PTO.

For the foregoing reasons, and under the facts and the law, there is no basis to find that intent to deceive is "the single most reasonable inference" here. There is no smoking gun evidence anywhere in the record. Nor is there anything resembling a bit of smoke. At bottom, Defendants' arguments are speculative and suffer from fatal flaws at critical junctures. As discussed above, Defendants cannot even show that the applications were intentionally abandoned despite spending vast resources and time into the effort. Now Defendants assert that this fact was so obvious that any modicum of investigation would have confirmed that. Defendants' claims do not square with the evidence. And where its entire intentional abandonment theory rests on Mr. Sidley's intent, it cannot explain why it never sought discovery from him.

The same puzzling lack of evidence applies to Defendants' intent to deceive allegations. As one example, Schwedler testified that he obtained all the information he needed from his colleague at Bullivant and other sources, and then independently concluded that the abandonments were unintentional based on that information. Common sense dictates that this is reasonable, and the *Asghari* provides further support. Defendants have no response to this reliance, and it is a result of their own negligence. They inexplicably did not ask a single follow-up question regarding Mr. Schwedler's Bullivant colleague. And just like with Mr. Sidley, Defendants did not attempt to obtain relevant discovery from this colleague for the Bullivant firm.

Indeed, Defendants' response to XR's undisputed fact 40 speaks volumes:

15

| | |
|---|---|
| 40. Defendants did not issue any document subpoenas or deposition notices to Aequitas Equipment Finance, LLC, Thomas Sidley, the Bullivant law firm, or Schwedler's colleague at Bullivant who was the client contact and managing partner of the case. Defendants did not receive any document production or deposition testimony from Aequitas Equipment Finance, LLC, Thomas Sidley, the Bullivant law firm, or Schwedler's colleague at Bullivant.<br><br>Chan Decl. ¶ 2. | **Undisputed.** |

Dkt. 477-13 at 11 (highlighting added).

### IV. Conclusion

The Court should grant partial summary judgment of no inequitable conduct. Therefore, the Court should grant partial summary judgment as to each Defendant's unenforceability affirmative defense as set forth in the proposed order (which Defendants do not dispute is accurate).

DATE: September 19, 2022                      Respectfully submitted,

**RUSS AUGUST & KABAT**

By: */s/ Reza Mirzaie*
    Reza Mirzaie
    Marc A. Fenster
    Philip X. Wang
    Christian Conkle
    Minna Y. Chan
    James Pickens

*Attorneys for Plaintiff*
XR COMMUNICATIONS, LLC,
dba VIVATO TECHNOLOGIES

# **CERTIFICATE OF SERVICE**

I hereby certify that the counsel of record who are deemed to have consented to electronic service are being served on September 19, 2022 with a copy of this document via the Court's ECF system.

                                               */s/ Reza Mirzaie*
                                               Reza Mirzaie

PLAINTIFF XR'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT     Case No. 8:17-cv-00596-DOC